# PERSONNEL ADMINISTRATOR OF MASSACHUSETTS ET AL. *v.* FEENEY

No. 78–233.   Argued February 26, 1979—Decided June 5, 1979

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, BLACKMUN, REHNQUIST, and STEVENS, JJ., joined. STEVENS, J., filed a concurring opinion, in which WHITE, J., joined, *post*, p. 281. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 281.

*Thomas R. Kiley,* Assistant Attorney General of Massachusetts, argued the cause for appellants. With him on the brief were *Francis X. Bellotti,* Attorney General, and *Edward F. Vena,* Assistant Attorney General.

*Richard P. Ward* argued the cause for appellee. With him on the brief were *Stephen B. Perlman, Eleanor D. Acheson, John H. Mason,* and *John Reinstein.**

---

*Briefs of *amici curiae* urging reversal were filed by *Solicitor General McCree, Deputy Solicitor General Easterbrook,* and *William C. Bryson* for the United States; and by *John J. Curtin, Jr.,* for the American Legion.

*Samuel J. Rabinove* and *Phyllis N. Segal* filed a brief for the National Organization for Women et al. as *amici curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Deanne Siemer* for the United States

MR. JUSTICE STEWART delivered the opinion of the Court.

This case presents a challenge to the constitutionality of the Massachusetts veterans' preference statute, Mass. Gen. Laws Ann., ch. 31, § 23, on the ground that it discriminates against women in violation of the Equal Protection Clause of the Fourteenth Amendment. Under ch. 31, § 23,[1] all veterans who qualify for state civil service positions must be considered for appointment ahead of any qualifying nonveterans. The preference operates overwhelmingly to the advantage of males.

The appellee Helen B. Feeney is not a veteran. She brought this action pursuant to 42 U. S. C. § 1983, alleging that the absolute-preference formula established in ch. 31, § 23, inevitably operates to exclude women from consideration for the best Massachusetts civil service jobs and thus unconstitutionally denies them the equal protection of the laws.[2] The three-judge District Court agreed, one judge dissenting. *Anthony* v. *Massachusetts,* 415 F. Supp. 485 (Mass. 1976).[3]

Office of Personnel Management et al.; and by *Paul D. Kamenar* for the Washington Legal Foundation.

[1] For the text of ch. 31, § 23, see n. 10, *infra.* The general Massachusetts Civil Service law, Mass. Gen. Laws Ann., ch. 31, was recodified on January 1, 1979, 1978 Mass. Acts, ch. 393, and the veterans' preference is now found at Mass. Gen. Laws Ann., ch. 31, § 26 (West 1979). Citations in this opinion, unless otherwise indicated, are to the ch. 31 codification in effect when this litigation was commenced.

[2] No statutory claim was brought under Title VII of the Civil Rights Act of 1964, 42 U S. C. § 2000e *et seq.* Section 712 of the Act, 42 U. S. C. § 2000e–11, provides that "[n]othing contained in this subchapter shall be construed to repeal or modify any Federal, State, territorial or local law creating special rights or preference for veterans." The parties have evidently assumed that this provision precludes a Title VII challenge.

[3] The appellee's case had been consolidated with a similar action brought by Carol A. Anthony, a lawyer whose efforts to obtain a civil service Counsel I position had been frustrated by ch. 31, § 23. In 1975, Massachusetts exempted all attorney positions from the preference, 1975 Mass. Acts, ch. 134, and Anthony's claims were accordingly found moot by the District Court. *Anthony* v. *Massachusetts,* 415 F. Supp., at 495.

The District Court found that the absolute preference afforded by Massachusetts to veterans has a devastating impact upon the employment opportunities of women. Although it found that the goals of the preference were worthy and legitimate and that the legislation had not been enacted for the purpose of discriminating against women, the court reasoned that its exclusionary impact upon women was nonetheless so severe as to require the State to further its goals through a more limited form of preference. Finding that a more modest preference formula would readily accommodate the State's interest in aiding veterans, the court declared ch. 31, § 23, unconstitutional and enjoined its operation.[4]

Upon an appeal taken by the Attorney General of Massachusetts,[5] this Court vacated the judgment and remanded the case for further consideration in light of our intervening decision in *Washington* v. *Davis,* 426 U. S. 229. *Massachusetts* v. *Feeney,* 434 U. S. 884. The *Davis* case held that a neutral law does not violate the Equal Protection Clause solely because it results in a racially disproportionate impact; instead the disproportionate impact must be traced to a purpose to discriminate on the basis of race. 426 U. S., at 238–244.

Upon remand, the District Court, one judge concurring and one judge again dissenting, concluded that a veterans' hiring preference is inherently nonneutral because it favors a class from which women have traditionally been excluded, and that

---

[4] The District Court entered a stay pending appeal, but the stay was rendered moot by the passage of an interim statute suspending ch. 31, § 23, pending final judgment and replacing it with an interim provision granting a modified point preference to veterans. 1976 Mass. Acts, ch. 200, now codified at Mass. Gen. Laws Ann., ch. 31, § 26 (West 1979).

[5] The Attorney General appealed the judgment over the objection of other state officers named as defendants. In response to our certification of the question whether Massachusetts law permits this, see *Massachusetts* v. *Feeney,* 429 U. S. 66, the Supreme Judicial Court answered in the affirmative. *Feeney* v. *Commonwealth,* 373 Mass. 359, 366 N. E. 2d 1262 (1977).

the consequences of the Massachusetts absolute-preference formula for the employment opportunities of women were too inevitable to have been "unintended." Accordingly, the court reaffirmed its original judgment. *Feeney* v. *Massachusetts*, 451 F. Supp. 143. The Attorney General again appealed to this Court pursuant to 28 U. S. C. § 1253, and probable jurisdiction of the appeal was noted. 439 U. S. 891.

## I

## A

The Federal Government and virtually all of the States grant some sort of hiring preference to veterans.[6] The Massachusetts preference, which is loosely termed an "absolute lifetime" preference, is among the most generous.[7] It

---

[6] The first comprehensive federal veterans' statute was enacted in 1944. Veterans' Preference Act of 1944, 58 Stat. 387. The Federal Government has, however, engaged in preferential hiring of veterans, through official policies and various special laws, since the Civil War. See, *e. g.*, Res. of Mar. 3, 1865, No. 27, 13 Stat. 571 (hiring preference for disabled veterans). See generally House Committee on Veterans' Affairs, The Provision of Federal Benefits for Veterans, An Historical Analysis of Major Veterans' Legislation, 1862–1954, 84th Cong., 1st Sess., 258–265 (Comm. Print 1955). For surveys of state veterans' preference laws, many of which also date back to the late 19th century, see State Veterans' Laws, Digests of State Laws Regarding Rights, Benefits, and Privileges of Veterns and Their Dependents, House Committee on Veterans' Affairs, 91st Cong., 1st Sess. (1969); Fleming & Shanor, Veterans Preferences in Public Employment: Unconstitutional Gender Discrimination?, 26 Emory L. J. 13 (1977).

[7] The forms of veterans' hiring preferences vary widely. The Federal Government and approximately 41 States grant veterans a point advantage on civil service examinations, usually 10 points for a disabled veteran and 5 for one who is not disabled. See Fleming & Shanor, *supra* n. 6, at 17, and n. 12 (citing statutes). A few offer only tie-breaking preferences. *Id.*, at n. 14 (citing statutes). A very few States, like Massachusetts, extend absolute hiring or positional preferences to qualified veterans. *Id.*, at n. 13. See, *e. g.*, N. J. Stat. Ann. § 11: 27–4 (West 1976); S. D. Comp. Laws Ann. § 3–3–1 (1974); Utah Code Ann. § 34–30–11 (1953); Wash. Rev. Code §§ 41.04.010, 73.16.010 (1976).

applies to all positions in the State's classified civil service, which constitute approximately 60% of the public jobs in the State. It is available to "any person, male or female, including a nurse," who was honorably discharged from the United States Armed Forces after at least 90 days of active service, at least one day of which was during "wartime." [8] Persons who are deemed veterans and who are otherwise qualified for a particular civil service job may exercise the preference at any time and as many times as they wish.[9]

[8] Massachusetts Gen. Laws Ann., ch. 4, § 7, Forty-third (West 1976), which supplies the general definition of the term "veteran," reads in pertinent part:

" 'Veteran' shall mean any person, male or female, including a nurse, (*a*) whose last discharge or release from his wartime service, as defined herein, was under honorable conditions and who (*b*) served in the army, navy, marine corps, coast guard, or air force of the United States for not less than ninety days active service, at least one day of which was for wartime service . . . ."

Persons awarded the Purple Heart, ch. 4, § 7, Forty-third, or one of a number of specified campaign badges or the Congressional Medal of Honor are also deemed veterans. Mass. Gen. Laws Ann., ch. 31, § 26 (West 1979).

"Wartime service" is defined as service performed by a "Spanish War veteran," a "World War I veteran," a "World War II veteran," a "Korean veteran," a "Vietnam veteran," or a member of the "WAAC." Mass. Gen. Laws Ann., ch. 4, § 7, Forty-third (West 1976). Each of these terms is further defined to specify a period of service. The statutory definitions, taken together, cover the entire period from September 16, 1940, to May 7, 1975. See *ibid.*

"WAAC" is defined as follows: "any woman who was discharged and so served in any corps or unit of the United States established for the purpose of enabling women to serve with, or as auxiliary to, the armed forces of the United States and such woman shall be deemed to be a veteran." *Ibid.*

[9] The Massachusetts preference law formerly imposed a residency requirement, see 1954 Mass. Acts, ch. 627, § 3 (eligibility conditioned upon Massachusetts domicile prior to induction or five years' residency in State). The distinction was invalidated as violative of the Equal Protection Clause in *Stevens* v. *Campbell*, 332 F. Supp. 102, 105 (Mass. 1971). Cf. *August* v. *Bronstein*, 369 F. Supp. 190 (SDNY 1974) (up-

Civil service positions in Massachusetts fall into two general categories, labor and official. For jobs in the official service, with which the proofs in this action were concerned, the preference mechanics are uncomplicated. All applicants for employment must take competitive examinations. Grades are based on a formula that gives weight both to objective test results and to training and experience. Candidates who pass are then ranked in the order of their respective scores on an "eligible list." Chapter 31, § 23, requires, however, that disabled veterans, veterans, and surviving spouses and surviving parents of veterans be ranked—in the order of their respective scores—above all other candidates.[10]

Rank on the eligible list and availability for employment are the sole factors that determine which candidates are considered for appointment to an official civil service position. When a public agency has a vacancy, it requisitions a list of "certified eligibles" from the state personnel division. Under formulas prescribed by civil service rules, a small number of candidates from the top of an appropriate list, three if there is only one vacancy, are certified. The appointing agency

---

holding, *inter alia,* nondurational residency requirement in New York veterans' preference statute), summarily aff'd, 417 U. S. 901.

[10] Chapter 31, § 23, provides in full:

"The names of persons who pass examinations for appointment to any position classified under the civil service shall be placed upon the eligible lists in the following order:—

"(1) Disabled veterans . . . in the order of their respective standing; (2) veterans in the order of their respective standing; (3) persons described in section twenty-three B [the widow or widowed mother of a veteran killed in action or who died from a service-connected disability incurred in wartime service and who has not remarried] in the order of their respective standing; (4) other applicants in the order of their respective standing. Upon receipt of a requisition, names shall be certified from such lists according to the method of certification prescribed by the civil service rules. A disabled veteran shall be retained in employment in preference to all other persons, including veterans."

A 1977 amendment extended the dependents' preference to "surviving spouses," and "surviving parents." 1977 Mass. Acts, ch. 815.

is then required to choose from among these candidates.[11] Although the veterans' preference thus does not guarantee that a veteran will be appointed, it is obvious that the preference gives to veterans who achieve passing scores a well-nigh absolute advantage.

## B

The appellee has lived in Dracut, Mass., most of her life. She entered the work force in 1948, and for the next 14 years worked at a variety of jobs in the private sector. She first entered the state civil service system in 1963, having competed successfully for a position as Senior Clerk Stenographer in the Massachusetts Civil Defense Agency. There she worked for four years. In 1967, she was promoted to the position of Federal Funds and Personnel Coordinator in the same agency. The agency, and with it her job, was eliminated in 1975.

During her 12-year tenure as a public employee, Ms. Feeney took and passed a number of open competitive civil service examinations. On several she did quite well, receiving in 1971 the second highest score on an examination for a job with the Board of Dental Examiners, and in 1973 the third highest on a test for an Administrative Assistant position with a mental health center. Her high scores, however, did not win her a place on the certified eligible list. Because of the veterans' preference, she was ranked sixth behind five male veterans on the Dental Examiner list. She was not certified, and a lower scoring veteran was eventually appointed. On the 1973 examination, she was placed in a position on the list behind 12 male veterans, 11 of whom had lower scores. Following the other examinations that she took, her name was similarly ranked below those of veterans who had achieved passing grades.

---

[11] A 1978 amendment requires the appointing authority to file a written statement of reasons if the person whose name was not highest is selected. 1978 Mass. Acts, ch. 393, § 11, currently codified at Mass. Gen. Laws Ann., ch. 31, § 27 (West 1979).

Ms. Feeney's interest in securing a better job in state government did not wane. Having been consistently eclipsed by veterans, however, she eventually concluded that further competition for civil service positions of interest to veterans would be futile. In 1975, shortly after her civil defense job was abolished, she commenced this litigation.

## C

The veterans' hiring preference in Massachusetts, as in other jurisdictions, has traditionally been justified as a measure designed to reward veterans for the sacrifice of military service, to ease the transition from military to civilian life, to encourage patriotic service, and to attract loyal and well-disciplined people to civil service occupations.[12] See, *e. g.*, *Hutcheson* v. *Director of Civil Service*, 361 Mass. 480, 281 N. E. 2d 53 (1972). The Massachusetts law dates back to 1884, when the State, as part of its first civil service legislation, gave a statutory preference to civil service applicants who were Civil War veterans if their qualifications were equal to those of nonveterans. 1884 Mass. Acts, ch. 320, § 14 (sixth). This tie-breaking provision blossomed into a truly absolute preference in 1895, when the State enacted its first general veterans' preference law and exempted veterans from all merit selection requirements. 1895 Mass. Acts, ch. 501, § 2. In response to a challenge brought by a male non-veteran, this statute was declared violative of state constitutional provisions guaranteeing that government should be

---

[12] Veterans' preference laws have been challenged so often that the rationale in their support has become essentially standardized. See, *e. g.*, *Koelfgen* v. *Jackson*, 355 F. Supp. 243 (Minn. 1972), summarily aff'd, 410 U. S. 976; *August* v. *Bronstein, supra; Rios* v. *Dillman*, 499 F. 2d 329 (CA5 1974); cf. *Mitchell* v. *Cohen*, 333 U. S. 411, 419 n. 12. See generally Blumberg, De Facto and De Jure Sex Discrimination Under the Equal Protection Clause: A Reconsideration of the Veterans' Preference in Public Employment, 26 Buffalo L. Rev. 3 (1977). For a collection of early cases, see Annot., Veterans' Preference Laws, 161 A. L. R. 494 (1946).

for the "common good" and prohibiting hereditary titles. *Brown* v. *Russell,* 166 Mass. 14, 43 N. E. 1005 (1896).

The current veterans' preference law has its origins in an 1896 statute, enacted to meet the state constitutional standards enunciated in *Brown* v. *Russell.* That statute limited the absolute preference to veterans who were otherwise qualified.[13] A closely divided Supreme Judicial Court, in an advisory opinion issued the same year, concluded that the preference embodied in such a statute would be valid. *Opinion of the Justices,* 166 Mass. 589, 44 N. E. 625 (1896). In 1919, when the preference was extended to cover the veterans of World War I, the formula was further limited to provide for a priority in eligibility, in contrast to an absolute preference in hiring.[14] See *Corliss* v. *Civil Service Comm'rs,* 242 Mass. 61, 136 N. E. 356 (1922). In *Mayor of Lynn* v. *Commissioner of Civil Service,* 269 Mass. 410, 414, 169 N. E. 502, 503–504 (1929), the Supreme Judicial Court, adhering to the views expressed in its 1896 advisory opinion, sustained this statute against a state constitutional challenge.

Since 1919, the preference has been repeatedly amended to cover persons who served in subsequent wars, declared or

---

[13] 1896 Mass. Acts, ch. 517, § 2. The statute provided that veterans who passed examinations should "be preferred in appointment to all persons not veterans . . . ." A proviso stated: "But nothing herein contained shall be construed to prevent the certification and employment of women."

[14] 1919 Mass. Acts, ch. 150, § 2. The amended statute provided that "the names of veterans who pass examinations . . . shall be placed upon the . . . eligible lists in the order of their respective standing, above the names of all other applicants," and further provided that "upon receipt of a requisition not especially calling for women, names shall be certified from such lists . . . ." The exemption for "women's requisitions" was retained in substantially this form in subsequent revisions, see, *e. g.,* 1954 Mass. Acts, ch. 627, § 5. It was eliminated in 1971, 1971 Mass. Acts, ch. 219, when the State made all single-sex examinations subject to the prior approval of the Massachusetts Commission Against Discrimination, 1971 Mass. Acts, ch. 221.

undeclared. See 1943 Mass. Acts, ch. 194; 1949 Mass. Acts, ch. 642, § 2 (World War II); 1954 Mass. Acts, ch. 627 (Korea); 1968 Mass. Acts, ch. 531, § 1 (Vietnam).[15] The current preference formula in ch. 31, § 23, is substantially the same as that settled upon in 1919. This absolute preference—even as modified in 1919—has never been universally popular. Over the years it has been subjected to repeated legal challenges, see *Hutcheson* v. *Director of Civil Service, supra* (collecting cases), to criticism by civil service reform groups, see, *e. g.,* Report of the Massachusetts Committee on Public Service on Initiative Bill Relative to Veterans' Preference, S. No. 279 (1926); Report of Massachusetts Special Commission on Civil Service and Public Personnel Administration 37–43 (June 15, 1967), and, in 1926, to a referendum in which it was reaffirmed by a majority of 51.9%. See *id.,* at 38. The present case is apparently the first to challenge the Massachusetts veterans' preference on the simple ground that it discriminates on the basis of sex.[16]

## D

The first Massachusetts veterans' preference statute defined the term "veterans" in gender-neutral language. See

---

[15] A provision requiring public agencies to hire disabled veterans certified as eligible was added in 1922. 1922 Mass. Acts, ch. 463. It was invalidated as applied in *Hutcheson* v. *Director of Civil Service,* 361 Mass. 480, 281 N. E. 2d 53 (1972) (suit by veteran arguing that absolute preference for disabled veterans was arbitrary on facts). It has since been eliminated and replaced with a provision giving disabled veterans an absolute preference in retention. See Mass. Gen. Laws Ann., ch. 31, § 26 (West 1979). See n. 10, *supra.*

[16] For cases presenting similar challenges to the veterans' preference laws of other States, see *Ballou* v. *State Department of Civil Service,* 75 N. J. 365, 382 A. 2d 1118 (1978) (sustaining New Jersey absolute preference); *Feinerman* v. *Jones,* 356 F. Supp. 252 (MD Pa. 1973) (sustaining Pennsylvania point preference); *Branch* v. *Du Bois,* 418 F. Supp. 1128 (ND Ill. 1976) (sustaining Illinois modified point preference); *Wisconsin Nat. Organization for Women* v. *Wisconsin,* 417 F. Supp. 978 (WD Wis. 1976) (sustaining Wisconsin point preference).

1896 Mass. Acts, ch. 517 § 1 ("a person" who served in the United States Army or Navy), and subsequent amendments have followed this pattern, see, *e. g.*, 1919 Mass. Acts, ch. 150, § 1 ("any person who has served . . ."); 1954 Mass Acts, ch. 627, § 1 ("any person, male or female, including a nurse"). Women who have served in official United States military units during wartime, then, have always been entitled to the benefit of the preference. In addition, Massachusetts, through a 1943 amendment to the definition of "wartime service," extended the preference to women who served in unofficial auxiliary women's units. 1943 Mass. Acts, ch. 194.[17]

When the first general veterans' preference statute was adopted in 1896, there were no women veterans.[18] The statute, however, covered only Civil War veterans. Most of them were beyond middle age, and relatively few were actively competing for public employment.[19] Thus, the impact of

---

[17] The provision, passed shortly after the creation of the Women's Army Auxiliary Corps (WAAC), see n. 21, *infra*, is currently found at Mass. Gen. Laws Ann., ch. 4, § 7, cl. 43 (West 1976), see n. 8, *supra*. "Wartime service" is defined as service performed by a member of the "WAAC." A "WAAC" is "any woman who was discharged and so served in any corps or unit of the United States established for the purpose of enabling women to serve with, or as auxiliary to, the armed forces of the United States and such woman shall be deemed to be a veteran." *Ibid.*

[18] Small numbers of women served in combat roles in every war before the 20th century in which the United States was involved, but usually unofficially or disguised as men. See M. Binkin & S. Bach, Women and the Military 5 (1977) (hereinafter Binkin and Bach). Among the better known are Molly Pitcher (Revolutionary War), Deborah Sampson (Revolutionary War), and Lucy Brewer (War of 1812). Passing as one "George Baker," Brewer served for three years as a gunner on the U. S. S. Constitution ("Old Ironsides") and distinguished herself in several major naval battles in the War of 1812. See J. Laffin, Women in Battle 116–122 (1967).

[19] By 1887, the average age of Civil War veterans in Massachusetts was already over 50. Massachusetts Civil Service Commissioners, Third Annual Report 22 (1887). The tie-breaking preference which had been established under the 1884 statute had apparently been difficult to enforce, since many appointing officers "prefer younger men." *Ibid.* The 1896

the preference upon the employment opportunities of non-veterans as a group and women in particular was slight.[20]

Notwithstanding the apparent attempts by Massachusetts to include as many military women as possible within the scope of the preference, the statute today benefits an overwhelmingly male class. This is attributable in some measure to the variety of federal statutes, regulations, and policies that have restricted the number of women who could enlist in the United States Armed Forces,[21] and largely to the simple

---

statute which established the first valid absolute preference, see *supra*, at 266, again covered only Civil War veterans. 1896 Mass. Acts, ch. 517, § 1.

[20] In 1896, for example, 2,804 persons applied for civil service positions: 2,031 were men, of whom only 32 were veterans; 773 were women. Of the 647 persons appointed, 525 were men, of whom only 9 were veterans; 122 were women. Massachusetts Civil Service Commissioners, Thirteenth Annual Report 5, 6 (1896). The average age of the applicants was 38. *Ibid.*

[21] The Army Nurse Corps, created by Congress in 1901, was the first official military unit for women, but its members were not granted full military rank until 1944. See Binkin and Bach 4–21; M. Treadwell, The Women's Army Corps 6 (Dept. of Army 1954) (hereinafter Treadwell). During World War I, a variety of ˋproposals were made to enlist women for work as doctors, telephone operators, and clerks, but all were rejected by the War Department. See *ibid.* The Navy, however, interpreted its own authority broadly to include a power to enlist women as Yeoman F's and Marine F's. About 13,000 women served in this rank, working primarily at clerical jobs. These women were the first in the United States to be admitted to full military rank and status. See *id.*, at 10.

Official military corps for women were established in response to the massive personnel needs of World War II. See generally Binkin and Bach; Treadwell. The Women's Army Auxiliary Corps (WAAC)—the unofficial predecessor of the Women's Army Corps (WAC)—was created on May 14, 1942, followed two months later by the WAVES (Women Accepted for Voluntary Emergency Service). See Binkin and Bach 7. Not long after, the United States Marine Corps Women's Reserve and the Coast Guard Women's Reserve (SPAR) were established. See *ibid.* Some 350,000 women served in the four services; some 800 women also served as Women's Airforce Service Pilots (WASPS). *Ibid.* Most worked in health care, administration, and communications; they were also em-

fact that women have never been subjected to a military draft. See generally Binkin and Bach 4–21.

When this litigation was commenced, then, over 98% of the veterans in Massachusetts were male; only 1.8% were female. And over one-quarter of the Massachusetts population were veterans. During the decade between 1963 and 1973 when the appellee was actively participating in the State's merit selection system, 47,005 new permanent appointments were made in the classified official service. Forty-three percent of those hired were women, and 57% were men. Of the women appointed, 1.8% were veterans, while 54% of the men had veteran status. A large unspecified percentage of the female appointees were serving in lower paying positions for which males traditionally had not applied.[22]

---

ployed as airplane mechanics, parachute riggers, gunnery instructors, air traffic controllers, and the like.

The authorizations for the women's units during World War II were temporary. The Women's Armed Services Integration Act of 1948, 62 Stat. 356, established the women's services on a permanent basis. Under the Act, women were given regular military status. However, quotas were placed on the numbers who could enlist, 62 Stat. 357, 360–361 (no more than 2% of total enlisted strength), eligibility requirements were more stringent than those for men, and career opportunities were limited. Binkin and Bach 11–12. During the 1950's and 1960's, enlisted women constituted little more than 1% of the total force. In 1967, the 2% quota was lifted, § 1 (9) (E), 81 Stat. 375, 10 U. S. C. § 3209 (b), and in the 1970's many restrictive policies concerning women's participation in the military have been eliminated or modified. See generally Binkin and Bach. In 1972, women still constituted less than 2% of the enlisted strength. Id., at 14. By 1975, when this litigation was commenced, the percentage had risen to 4.6%. Ibid.

[22] The former exemption for "women's requisitions," see nn. 13, 14, supra, may have operated in the 20th century to protect these types of jobs from the impact of the preference. However, the statutory history indicates that this was not its purpose. The provision dates back to the 1896 veterans' preference law and was retained in the law substantially unchanged until it was eliminated in 1971. See n. 14, supra. Since veterans in 1896 were a small but an exclusively male class, such a pro-

On each of 50 sample eligible lists that are part of the record in this case, one or more women who would have been certified as eligible for appointment on the basis of test results were displaced by veterans whose test scores were lower.

At the outset of this litigation appellants conceded that for "many of the permanent positions for which males and females have competed" the veterans' preference has "resulted in a substantially greater proportion of female eligibles than male eligibles" not being certified for consideration. The impact of the veterans' preference law upon the public employment opportunities of women has thus been severe. This impact lies at the heart of the appellee's federal constitutional claim.

## II

The sole question for decision on this appeal is whether Massachusetts, in granting an absolute lifetime preference to veterans, has discriminated against women in violation of the Equal Protection Clause of the Fourteenth Amendment.

## A

The equal protection guarantee of the Fourteenth Amendment does not take from the States all power of classification. *Massachusetts Bd. of Retirement* v. *Murgia,* 427 U. S. 307, 314. Most laws classify, and many affect certain groups

---

vision was apparently included to ensure that the statute would not be construed to outlaw a pre-existing practice of single-sex hiring explicitly authorized under the 1884 Civil Service statute. See Rule XIX.3, Massachusetts Civil Service Law and Rules and Regulations of the Commissioners (1884) ("In case the request for any . . . certification, or any law or regulation, shall call for persons of one sex, those of that sex shall be certified; otherwise sex shall be disregarded in certification"). The veterans' preference statute at no point endorsed this practice. Historical materials indicate, however, that the early preference law may have operated to encourage the employment of women in positions from which they previously had been excluded. See Thirteenth Annual Report, *supra* n. 20, at 5, 6; Third Annual Report, *supra* n. 19, at 23.

unevenly, even though the law itself treats them no differently from all other members of the class described by the law. When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern. *New York City Transit Authority* v. *Beazer,* 440 U. S. 568; *Jefferson* v. *Hackney,* 406 U. S. 535, 548. Cf. *James* v. *Valtierra,* 402 U. S. 137. The calculus of effects, the manner in which a particular law reverberates in a society, is a legislative and not a judicial responsibility. *Dandridge* v. *Williams,* 397 U. S. 471; *San Antonio School Dist.* v. *Rodriguez,* 411 U. S. 1. In assessing an equal protection challenge, a court is called upon only to measure the basic validity of the legislative classification. *Barrett* v. *Indiana,* 229 U. S. 26, 29–30; *Railway Express Agency* v. *New York,* 336 U. S. 106. When some other independent right is not at stake, see, *e. g., Shapiro* v. *Thompson,* 394 U. S. 618, and when there is no "reason to infer antipathy," *Vance* v. *Bradley,* 440 U. S. 93, 97, it is presumed that "even improvident decisions will eventually be rectified by the democratic process . . . ." *Ibid.*

Certain classifications, however, in themselves supply a reason to infer antipathy. Race is the paradigm. A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification. *Brown* v. *Board of Education,* 347 U. S. 483; *McLaughlin* v. *Florida,* 379 U. S. 184. This rule applies as well to a classification that is ostensibly neutral but is an obvious pretext for racial discrimination. *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Guinn* v. *United States,* 238 U. S. 347; cf. *Lane* v. *Wilson,* 307 U. S. 268; *Gomillion* v. *Lightfoot,* 364 U. S. 339. But, as was made clear in *Washington* v. *Davis,* 426 U. S. 229, and *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, even if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose.

Classifications based upon gender, not unlike those based upon race, have traditionally been the touchstone for pervasive and often subtle discrimination. *Caban* v. *Mohammed,* 441 U. S. 380, 398 (STEWART, J., dissenting). This Court's recent cases teach that such classifications must bear a close and substantial relationship to important governmental objectives, *Craig* v. *Boren,* 429 U. S. 190, 197, and are in many settings unconstitutional. *Reed* v. *Reed,* 404 U. S. 71;, *Frontiero* v. *Richardson,* 411 U. S. 677; *Weinberger* v. *Wiesenfeld,* 420 U. S. 636; *Craig* v. *Boren, supra; Califano* v. *Goldfarb,* 430 U. S. 199; *Orr* v. *Orr,* 440 U. S. 268; *Caban* v. *Mohammed, supra.* Although public employment is not a constitutional right, *Massachusetts Bd. of Retirement* v. *Murgia, supra,* and the States have wide discretion in framing employee qualifications, see, *e. g., New York City Transit Authority* v. *Beazer, supra,* these precedents dictate that any state law overtly or covertly designed to prefer males over females in public employment would require an exceedingly persuasive justification to withstand a constitutional challenge under the Equal Protection Clause of the Fourteenth Amendment.

**B**

The cases of *Washington* v. *Davis, supra,* and *Arlington Heights* v. *Metropolitan Housing Dev. Corp., supra,* recognize that when a neutral law has a disparate impact upon a group that has historically been the victim of discrimination, an unconstitutional purpose may still be at work. But those cases signaled no departure from the settled rule that the Fourteenth Amendment guarantees equal laws, not equal results. *Davis* upheld a job-related employment test that white people passed in proportionately greater numbers than Negroes, for there had been no showing that racial discrimination entered into the establishment or formulation of the test. *Arlington Heights* upheld a zoning board decision that tended to perpetuate racially segregated housing patterns,

since, apart from its effect, the board's decision was shown to be nothing more than an application of a constitutionally neutral zoning policy. Those principles apply with equal force to a case involving alleged gender discrimination.

When a statute gender-neutral on its face is challenged on the ground that its effects upon women are disproportionably adverse, a twofold inquiry is thus appropriate. The first question is whether the statutory classification is indeed neutral in the sense that it is not gender based. If the classification itself, covert or overt, is not based upon gender, the second question is whether the adverse effect reflects invidious gender-based discrimination. See *Arlington Heights* v. *Metropolitan Housing Dev. Corp., supra.* In this second inquiry, impact provides an "important starting point," 429 U. S., at 266, but purposeful discrimination is "the condition that offends the Constitution." *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 16.

It is against this background of precedent that we consider the merits of the case before us.

## III

### A

The question whether ch. 31, § 23, establishes a classification that is overtly or covertly based upon gender must first be considered. The appellee has conceded that ch. 31, § 23, is neutral on its face. She has also acknowledged that state hiring preferences for veterans are not *per se* invalid, for she has limited her challenge to the absolute lifetime preference that Massachusetts provides to veterans. The District Court made two central findings that are relevant here: first, that ch. 31, § 23, serves legitimate and worthy purposes; second, that the absolute preference was not established for the purpose of discriminating against women. The appellee has thus acknowledged and the District Court has thus found

that the distinction between veterans and nonveterans drawn by ch. 31, § 23, is not a pretext for gender discrimination. The appellee's concession and the District Court's finding are clearly correct.

If the impact of this statute could not be plausibly explained on a neutral ground, impact itself would signal that the real classification made by the law was in fact not neutral. See *Washington* v. *Davis*, 426 U. S., at 242; *Arlington Heights* v. *Metropolitan Housing Dev. Corp., supra,* at 266. But there can be but one answer to the question whether this veteran preference excludes significant numbers of women from preferred state jobs because they are women or because they are nonveterans. Apart from the facts that the definition of "veterans" in the statute has always been neutral as to gender and that Massachusetts has consistently defined veteran status in a way that has been inclusive of women who have served in the military, this is not a law that can plausibly be explained only as a gender-based classification. Indeed, it is not a law that can rationally be explained on that ground. Veteran status is not uniquely male. Although few women benefit from the preference, the nonveteran class is not substantially all female. To the contrary, significant numbers of nonveterans are men, and all nonveterans—male as well as female—are placed at a disadvantage. Too many men are affected by ch. 31, § 23, to permit the inference that the statute is but a pretext for preferring men over women.

Moreover, as the District Court implicitly found, the purposes of the statute provide the surest explanation for its impact. Just as there are cases in which impact alone can unmask an invidious classification, cf. *Yick Wo* v. *Hopkins,* 118 U. S. 356, there are others, in which—notwithstanding impact—the legitimate noninvidious purposes of a law cannot be missed. This is one. The distinction made by ch. 31, § 23, is, as it seems to be, quite simply between veterans and nonveterans, not between men and women.

## B

The dispositive question, then, is whether the appellee has shown that a gender-based discriminatory purpose has, at least in some measure, shaped the Massachusetts veterans' preference legislation. As did the District Court, she points to two basic factors which in her view distinguish ch. 31, § 23, from the neutral rules at issue in the *Washington* v. *Davis* and *Arlington Heights* cases. The first is the nature of the preference, which is said to be demonstrably gender-biased in the sense that it favors a status reserved under federal military policy primarily to men. The second concerns the impact of the absolute lifetime preference upon the employment opportunities of women, an impact claimed to be too inevitable to have been unintended. The appellee contends that these factors, coupled with the fact that the preference itself has little if any relevance to actual job performance, more than suffice to prove the discriminatory intent required to establish a constitutional violation.

### 1

The contention that this veterans' preference is "inherently nonneutral" or "gender-biased" presumes that the State, by favoring veterans, intentionally incorporated into its public employment policies the panoply of sex-based and assertedly discriminatory federal laws that have prevented all but a handful of women from becoming veterans. There are two serious difficulties with this argument. First, it is wholly at odds with the District Court's central finding that Massachusetts has not offered a preference to veterans for the purpose of discriminating against women. Second, it cannot be reconciled with the assumption made by both the appellee and the District Court that a more limited hiring preference for veterans could be sustained. Taken together, these difficulties are fatal.

To the extent that the status of veteran is one that few

women have been enabled to achieve, every hiring preference for veterans, however modest or extreme, is inherently gender-biased. If Massachusetts by offering such a preference can be said intentionally to have incorporated into its state employment policies the historical gender-based federal military personnel practices, the degree of the preference would or should make no constitutional difference. Invidious discrimination does not become less so because the discrimination accomplished is of a lesser magnitude.[23] Discriminatory intent is simply not amenable to calibration. It either is a factor that has influenced the legislative choice or it is not. The District Court's conclusion that the absolute veterans' preference was not originally enacted or subsequently reaffirmed for the purpose of giving an advantage to males as such necessarily compels the conclusion that the State intended nothing more than to prefer "veterans." Given this finding, simple logic suggests that an intent to exclude women from significant public jobs was not at work in this law. To reason that it was, by describing the preference as "inherently nonneutral" or "gender-biased," is merely to restate the fact of impact, not to answer the question of intent.

To be sure, this case is unusual in that it involves a law that by design is not neutral. The law overtly prefers veterans as such. As opposed to the written test at issue in *Davis,* it does not purport to define a job-related characteristic. To the contrary, it confers upon a specifically described group—perceived to be particularly deserving—a competitive headstart. But the District Court found, and the appellee has not disputed, that this legislative choice was legitimate. The basic distinction between veterans and nonveterans, having been found not gender-based, and the goals of the

---

[23] This is not to say that the degree of impact is irrelevant to the question of intent. But it is to say that a more modest preference, while it might well lessen impact and, as the State argues, might lessen the effectiveness of the statute in helping veterans, would not be any more or less "neutral" in the constitutional sense.

preference having been found worthy, ch. 31 must be analyzed as is any other neutral law that casts a greater burden upon women as a group than upon men as a group. The enlistment policies of the Armed Services may well have discriminated on the basis of sex. See *Frontiero* v. *Richardson,* 411 U. S. 677; cf. *Schlesinger* v. *Ballard,* 419 U. S. 498. But the history of discrimination against women in the military is not on trial in this case.

2

The appellee's ultimate argument rests upon the presumption, common to the criminal and civil law, that a person intends the natural and foreseeable consequences of his voluntary actions. Her position was well stated in the concurring opinion in the District Court:

"Conceding . . . that the goal here was to benefit the veteran, there is no reason to absolve the legislature from awareness that the means chosen to achieve this goal would freeze women out of all those state jobs actively sought by men. To be sure, the legislature did not wish to harm women. But the cutting-off of women's opportunities was an inevitable concomitant of the chosen scheme—as inevitable as the proposition that if tails is up, heads must be down. Where a law's consequences are *that* inevitable, can they meaningfully be described as unintended?" 451 F. Supp., at 151.

This rhetorical question implies that a negative answer is obvious, but it is not. The decision to grant a preference to veterans was of course "intentional." So, necessarily, did an adverse impact upon nonveterans follow from that decision. And it cannot seriously be argued that the Legislature of Massachusetts could have been unaware that most veterans are men. It would thus be disingenuous to say that the adverse consequences of this legislation for women were unintended, in the sense that they were not volitional or in the sense that they were not foreseeable.

"Discriminatory purpose," however, implies more than intent as volition or intent as awareness of consequences. See *United Jewish Organizations* v. *Carey,* 430 U. S. 144, 179 (concurring opinion).[24] It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.[25] Yet nothing in the record demonstrates that this preference for veterans was originally devised or subsequently re-enacted because it would accomplish the collateral goal of keeping women in a stereotypic and predefined place in the Massachusetts Civil Service.

To the contrary, the statutory history shows that the benefit of the preference was consistently offered to "any person" who was a veteran. That benefit has been extended to women under a very broad statutory definition of the term veteran.[26] The preference formula itself, which is the focal

[24] Proof of discriminatory intent must necessarily usually rely on objective factors, several of which were outlined in *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, 266. The inquiry is practical. What a legislature or any official entity is "up to" may be plain from the results its actions achieve, or the results they avoid. Often it is made clear from what has been called, in a different context, "the give and take of the situation." *Cramer* v. *United States,* 325 U. S. 1, 32–33 (Jackson, J.).

[25] This is not to say that the inevitability or foreseeability of consequences of a neutral rule has no bearing upon the existence of discriminatory intent. Certainly, when the adverse consequences of a law upon an identifiable group are as inevitable as the gender-based consequences of ch. 31, § 23, a strong inference that the adverse effects were desired can reasonably be drawn. But in this inquiry—made as it is under the Constitution—an inference is a working tool, not a synonym for proof. When, as here, the impact is essentially an unavoidable consequence of a legislative policy that has in itself always been deemed to be legitimate, and when, as here, the statutory history and all of the available evidence affirmatively demonstrate the opposite, the inference simply fails to ripen into proof.

[26] See nn. 8, 17, *supra.*

point of this challenge, was first adopted—so it appears from this record—out of a perceived need to help a small group of older Civil War veterans. It has since been reaffirmed and extended only to cover new veterans.[27] When the totality of legislative actions establishing and extending the Massachusetts veterans' preference are considered, see *Washington* v. *Davis,* 426 U. S., at 242, the law remains what it purports to be: a preference for veterans of either sex over nonveterans of either sex, not for men over women.

## IV

Veterans' hiring preferences represent an awkward—and, many argue, unfair—exception to the widely shared view that merit and merit alone should prevail in the employment policies of government. After a war, such laws have been enacted virtually without opposition. During peacetime, they inevitably have come to be viewed in many quarters as undemocratic and unwise.[28] Absolute and permanent preferences, as the troubled history of this law demonstrates, have always been subject to the objection that they give the vet-

---

[27] The appellee has suggested that the former statutory exception for "women's requisitions," see nn. 13, 14, *supra,* supplies evidence that Massachusetts, when it established and subsequently reaffirmed the absolute-preference legislation, assumed that women would not or should not compete with men. She has further suggested that the former provision extending the preference to certain female dependents of veterans, see n. 10, *supra,* demonstrates that ch. 31, § 23, is laced with "old notions" about the proper roles and needs of the sexes. See *Califano* v. *Goldfarb,* 430 U. S. 199; *Weinberger* v. *Wiesenfeld,* 420 U. S. 636. But the first suggestion is totally belied by the statutory history, see *supra,* at 267–271, and nn. 19, 20, and the second fails to account for the consistent statutory recognition of the contribution of women to this Nation's military efforts.

[28] See generally Hearings on Veterans' Preference Oversight before the Subcommittee on Civil Service of the House Post Office and Civil Service Committee, 95th Cong., 1st Sess. (1977); Report of Comptroller General, Conflicting Congressional Policies: Veterans' Preference and Apportionment vs. Equal Employment Opportunity (Sept. 29, 1977).

eran more than a square deal. But the Fourteenth Amendment "cannot be made a refuge from ill-advised . . . laws." *District of Columbia* v. *Brooke,* 214 U. S. 138, 150. The substantial edge granted to veterans by ch. 31, § 23, may reflect unwise policy. The appellee, however, has simply failed to demonstrate that the law in any way reflects a purpose to discriminate on the basis of sex.

The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Mr. Justice Stevens, with whom Mr. Justice White joins, concurring.

While I concur in the Court's opinion, I confess that I am not at all sure that there is any difference between the two questions posed *ante,* at 274. If a classification is not overtly based on gender, I am inclined to believe the question whether it is covertly gender based is the same as the question whether its adverse effects reflect invidious gender-based discrimination. However the question is phrased, for me the answer is largely provided by the fact that the number of males disadvantaged by Massachusetts' veterans' preference (1,867,000) is sufficiently large—and sufficiently close to the number of disadvantaged females (2,954,000)—to refute the claim that the rule was intended to benefit males as a class over females as a class.

Mr. Justice Marshall, with whom Mr. Justice Brennan joins, dissenting.

Although acknowledging that in some circumstances, discriminatory intent may be inferred from the inevitable or foreseeable impact of a statute, *ante,* at 279 n. 25, the Court concludes that no such intent has been established here. I cannot agree. In my judgment, Massachusetts' choice of an absolute veterans' preference system evinces purposeful

gender-based discrimination. And because the statutory scheme bears no substantial relationship to a legitimate governmental objective, it cannot withstand scrutiny under the Equal Protection Clause.

I

The District Court found that the "prime objective" of the Massachusetts veterans' preference statute, Mass. Gen. Laws Ann., ch. 31, § 23, was to benefit individuals with prior military service. *Anthony* v. *Commonweath,* 415 F. Supp. 485, 497 (Mass. 1976). See *Feeney* v. *Massachusetts,* 451 F. Supp. 143, 145 (Mass. 1978). Under the Court's analysis, this factual determination "necessarily compels the conclusion that the State intended nothing more than to prefer 'veterans.' Given this finding, simple logic suggests than an intent to exclude women from significant public jobs was not at work in this law." *Ante,* at 277. I find the Court's logic neither simple nor compelling.

That a legislature seeks to advantage one group does not, as a matter of logic or of common sense, exclude the possibility that it also intends to disadvantage another. Individuals in general and lawmakers in particular frequently act for a variety of reasons. As this Court recognized in *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, 265 (1977), "[r]arely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern." Absent an omniscience not commonly attributed to the judiciary, it will often be impossible to ascertain the sole or even dominant purpose of a given statute. See *McGinnis* v. *Royster,* 410 U. S. 263, 276–277 (1973); Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L. J. 1205, 1214 (1970). Thus, the critical constitutional inquiry is not whether an illicit consideration was the primary or but-for cause of a decision, but rather whether it had an appreciable role in shaping a given legislative enactment. Where there is

"proof that a discriminatory purpose has been *a* motivating factor in the decision, . . . judicial deference is no longer justified." *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, *supra*, at 265–266 (emphasis added).

Moreover, since reliable evidence of subjective intentions is seldom obtainable, resort to inference based on objective factors is generally unavoidable. See *Beer* v. *United States*, 425 U. S. 130, 148–149, n. 4 (1976) (MARSHALL, J., dissenting); cf. *Palmer* v. *Thompson*, 403 U. S. 217, 224–225 (1971); *United States* v. *O'Brien*, 391 U. S. 367, 383–384 (1968). To discern the purposes underlying facially neutral policies, this Court has therefore considered the degree, inevitability, and foreseeability of any disproportionate impact as well as the alternatives reasonably available. See *Monroe* v. *Board of Commissioners*, 391 U. S. 450, 459 (1968); *Goss* v. *Board of Education*, 373 U. S. 683, 688–689 (1963); *Gomillion* v. *Lightfoot*, 364 U. S. 339 (1960); *Griffin* v. *Illinois*, 351 U. S. 12, 17 n. 11 (1956). Cf. *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 425 (1975).

In the instant case, the impact of the Massachusetts statute on women is undisputed. Any veteran with a passing grade on the civil service exam must be placed ahead of a nonveteran, regardless of their respective scores. The District Court found that, as a practical matter, this preference supplants test results as the determinant of upper level civil service appointments. 415 F. Supp., at 488–489. Because less than 2% of the women in Massachusetts are veterans, the absolute-preference formula has rendered desirable state civil service employment an almost exclusively male prerogative. 451 F. Supp., at 151 (Campbell, J., concurring).

As the District Court recognized, this consequence follows foreseeably, indeed inexorably, from the long history of policies severely limiting women's participation in the military.[1]

---

[1] See *Anthony* v. *Massachusetts*, 415 F. Supp. 485, 490, 495–499 (Mass. 1976); *Feeney* v. *Massachusetts*, 451 F. Supp. 143, 145, 148 (Mass.

Although neutral in form, the statute is anything but neutral in application. It inescapably reserves a major sector of public employment to "an already established class which, as a matter of historical fact, is 98% male." *Ibid.* Where the foreseeable impact of a facially neutral policy is so disproportionate, the burden should rest on the State to establish that sex-based considerations played no part in the choice of the particular legislative scheme. Cf. *Castaneda* v. *Partida,* 430 U. S. 482 (1977); *Washington* v. *Davis,* 426 U. S. 229, 241 (1976); *Alexander* v. *Louisiana,* 405 U. S. 625, 632 (1972); see generally Brest, *Palmer* v. *Thompson*: An Approach to the Problem of Unconstitutional Legislative Motive, 1971 Sup. Ct. Rev. 95, 123.

Clearly, that burden was not sustained here. The legislative history of the statute reflects the Commonwealth's patent appreciation of the impact the preference system would have on women, and an equally evident desire to mitigate that impact only with respect to certain traditionally female occupations. Until 1971, the statute and implementing civil serv-

1978). In addition to the 2% quota on women's participation in the Armed Forces, see *ante,* at 270 n. 21, enlistment and appointment requirements have been more stringent for females than males with respect to age, mental and physical aptitude, parental consent, and educational attainment. M. Binkin & S. Bach, Women and the Military (1977) (hereinafter Binkin and Bach); Note, The Equal Rights Amendment and the Military, 82 Yale L. J. 1533, 1539 (1973). Until the 1970's, the Armed Forces precluded enlistment and appointment of women, but not men, who were married or had dependent children. See 415 F. Supp., at 490; App. 85; Exs. 98, 99, 103, 104. Sex-based restrictions on advancement and training opportunities also diminished the incentives for qualified women to enlist. See Binkin and Bach 10–17; Beans, Sex Discrimination in the Military, 67 Mil. L. Rev. 19, 59–83 (1975). Cf. *Schlesinger* v. *Ballard,* 419 U. S. 498, 508 (1975).

Thus, unlike the employment examination in *Washington* v. *Davis,* 426 U. S. 229 (1976), which the Court found to be demonstrably job related, the Massachusetts preference statute incorporates the results of sex-based military policies irrelevant to women's current fitness for civilian public employment. See 415 F. Supp., at 498–499.

ice regulations exempted from operation of the preference any job requisitions "especially calling for women." 1954 Mass. Acts, ch. 627, § 5. See also 1896 Mass. Acts, ch. 517, § 6; 1919 Mass. Acts, ch. 150, § 2; 1945 Mass. Acts, ch. 725, § 2 (e); 1965 Mass. Acts, ch. 53; *ante,* at 266 nn. 13, 14. In practice, this exemption, coupled with the absolute preference for veterans, has created a gender-based civil service hierarchy, with women occupying low-grade clerical and secretarial jobs and men holding more responsible and remunerative positions. See 415 F. Supp., at 488; 451 F. Supp., at 148 n. 9.

Thus, for over 70 years, the Commonwealth has maintained, as an integral part of its veterans' preference system, an exemption relegating female civil service applicants to occupations traditionally filled by women. Such a statutory scheme both reflects and perpetuates precisely the kind of archaic assumptions about women's roles which we have previously held invalid. See *Orr* v. *Orr,* 440 U. S. 268 (1979); *Califano* v. *Goldfarb,* 430 U. S. 199, 210–211 (1977); *Stanton* v. *Stanton,* 421 U. S. 7, 14 (1975); *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 645 (1975). Particularly when viewed against the range of less discriminatory alternatives available to assist veterans,[2] Massachusetts' choice of a formula that so severely restricts public employment opportunities for women cannot reasonably be thought gender-neutral. Cf. *Albemarle Paper Co.* v. *Moody, supra,* at 425. The Court's conclusion to the contrary—that "nothing in the record" evinces a "collateral goal of keeping women in a stereotypic and predefined place in the

---

[2] Only four States afford a preference comparable in scope to that of Massachusetts. See Fleming & Shanor, Veterans' Preferences and Public Employment: Unconstitutional Gender Discrimination?, 26 Emory L. J. 13, 17 n. 13 (1977) (citing statutes). Other States and the Federal Government grant point or tie-breaking preferences that do not foreclose opportunities for women. See *id.,* at 13, and nn. 12, 14; *ante,* at 261 n. 7; Hearings on Veterans' Preference Oversight before the Subcommittee on Civil Service of the House Committee on Post Office and Civil Service, 95th Cong., 1st Sess., 4 (1977) (statement of Alan Campbell, Chairman, United States Civil Service Commission).

Massachusetts Civil Service," *ante,* at 279—displays a singularly myopic view of the facts established below.[3]

## II

To survive challenge under the Equal Protection Clause, statutes reflecting gender-based discrimination must be substantially related to the achievement of important governmental objectives. See *Califano* v. *Webster,* 430 U. S. 313, 316–317 (1977); *Craig* v. *Boren,* 429 U. S. 190, 197 (1976); *Reed* v. *Reed,* 404 U. S. 71, 76 (1971). Appellants here advance three interests in support of the absolute-preference system: (1) assisting veterans in their readjustment to civilian life; (2) encouraging military enlistment; and (3) rewarding those who have served their country. Brief for Appellants 24. Although each of those goals is unquestionably legitimate, the "mere recitation of a benign, compensatory purpose" cannot of itself insulate legislative classifications from constitutional scrutiny. *Weinberger* v. *Wiesenfeld, supra,* at 648. And in this case, the Commonwealth has failed to establish a sufficient relationship between its objectives and the means chosen to effectuate them.

With respect to the first interest, facilitating veterans' transition to civilian status, the statute is plainly overinclusive. Cf. *Trimble* v. *Gordon,* 430 U. S. 762, 770–772 (1977); *Jimenez* v. *Weinberger,* 417 U. S. 628, 637 (1974). By conferring a permanent preference, the legislation allows veterans to invoke their advantage repeatedly, without regard to their date of discharge. As the record demonstrates, a substantial

---

[3] Although it is relevant that the preference statute also disadvantages a substantial group of men, see *ante,* at 281 (STEVENS, J., concurring), it is equally pertinent that 47% of Massachusetts men over 18 are veterans, as compared to 0.8% of Massachusetts women. App. 83. Given this disparity, and the indicia of intent noted *supra,* at 284–285, the absolute number of men denied preference cannot be dispositive, especially since they have not faced the barriers to achieving veteran status confronted by women. See n. 1, *supra.*

majority of those currently enjoying the benefits of the system are not recently discharged veterans in need of readjustment assistance.[4]

Nor is the Commonwealth's second asserted interest, encouraging military service, a plausible justification for this legislative scheme. In its original and subsequent re-enactments, the statute extended benefits retroactively to veterans who had served during a prior specified period. See *ante,* at 265–267. If the Commonwealth's "actual purpose" is to induce enlistment, this legislative design is hardly well suited to that end. See *Califano* v. *Webster, supra,* at 317; *Weinberger* v. *Wiesenfeld, supra,* at 648. For I am unwilling to assume what appellants made no effort to prove, that the possibility of obtaining an *ex post facto* civil service preference significantly influenced the enlistment decisions of Massachusetts residents. Moreover, even if such influence could be presumed, the statute is still grossly overinclusive in that it bestows benefits on men drafted as well as those who volunteered.

Finally, the Commonwealth's third interest, rewarding veterans, does not "adequately justify the salient features" of this preference system. *Craig* v. *Boren, supra,* at 202–203. See *Orr* v. *Orr, supra,* at 281. Where a particular statutory scheme visits substantial hardship on a class long subject to discrimination, the legislation cannot be sustained unless " 'carefully tuned to alternative considerations.' " *Trimble* v. *Gordon, supra,* at 772. See *Caban* v. *Mohammed,* 441 U. S. 380, 392–393, n. 13 (1979); *Mathews* v. *Lucas,* 427 U. S. 495 (1976). Here, there are a wide variety of less discriminatory means by which Massachusetts could effect its compensatory purposes. For example, a point preference system, such as that maintained by many States and the Federal Government,

---

[4] The eligibility lists for the positions Ms. Feeney sought included 95 veterans for whom discharge information was available. Of those 95 males, 64 (67%) were discharged prior to 1960. App. 106, 150–151, 169–170.

see n. 2, *supra,* or an absolute preference for a limited duration, would reward veterans without excluding all qualified women from upper level civil service positions. Apart from public employment, the Commonwealth, can, and does, afford assistance to veterans in various ways, including tax abatements, educational subsidies, and special programs for needy veterans. See Mass. Gen. Laws Ann., ch. 59, § 5, Fifth (West Supp. 1979); Mass. Gen. Laws Ann., ch. 69, §§ 7, 7B (West Supp. 1979); and Mass. Gen. Laws Ann., chs. 115, 115A (West 1969 and Supp. 1978). Unlike these and similar benefits, the costs of which are distributed across the taxpaying public generally, the Massachusetts statute exacts a substantial price from a discrete group of individuals who have long been subject to employment discrimination,[5] and who, "because of circumstances totally beyond their control, have [had] little if any chance of becoming members of the preferred class." 415 F. Supp., at 499. See n. 1, *supra.*

In its present unqualified form, the veterans' preference statute precludes all but a small fraction of Massachusetts women from obtaining any civil service position also of interest to men. See 451 F. Supp., at 151 (Campbell, J., concurring). Given the range of alternatives available, this degree of preference is not constitutionally permissible.

I would affirm the judgment of the court below.

---

[5] See *Frontiero* v. *Richardson,* 411 U. S. 677, 689 n. 23 (1973); *Kahn* v. *Shevin,* 416 U. S. 351, 353–354 (1974); United States Bureau of the Census, Current Population Reports, No. 107, Money Income and Poverty Status of Families and Persons in the United States: 1976 (Advance Report) (Table 7) (Sept. 1977).