**Richard LINDSAY, et al.**

v.

**CITY OF PHILADELPHIA, et al.**

**Civ.A. No. 93–6650.**

United States District Court,
E.D. Pennsylvania.

Feb. 10, 1994.

---

Malcolm W. Berkowitz, Philadelphia, PA, for plaintiffs.

Terrilyn R. Elliott, Asst. City Sol., Philadelphia, PA, for defendants.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

The question before me is whether, on the basis of an alleged violation of the Equal Protection Clause, the plaintiffs are entitled to a preliminary injunction to halt the implementation of an ordinance which regulates sidewalk vending in Center City Philadelphia, when the statute is facially neutral and there is no evidence of an intent or policy on the part of the City to disadvantage the plaintiffs because of their race. I hold that the plaintiffs are not entitled to the injunction.

The plaintiffs, a group of African American sidewalk vendors, filed their complaint and motion for preliminary injunction pursuant to 42 U.S.C. § 1983 on December 14, 1993. The plaintiffs claim that Section 9–204 was designed to reduce the number of African American sidewalk vendors in Center City, and that the manner of its implementation violated their constitutional rights in a number of ways. They allege that most of them have been forced to vacate the vending locations they had occupied for periods ranging from two to ten years, resulting in the reduction or loss of their businesses. On January 5, 1994, I entered an order declining to issue a preliminary injunction on the basis of the plaintiffs' due process and impairment of contracts claims and ordering an evidentiary hearing on the equal protection claim. After hearing the evidence and considering the arguments of counsel presented to me at the evidentiary hearing on January 18, 1994, I

am prepared to rule on the issue of whether the plaintiffs' claim that Section 9–204 was enforced in a racially discriminatory manner entitles them to a preliminary injunction.

## FINDINGS OF FACT

1) The plaintiffs are African–Americans who have engaged in the business of sidewalk vending in Center City Philadelphia for up to ten years.[1] Most of them have held sidewalk vending licenses in their own names at one time or another, though few have done so for the entire time they have been vending.

2) On December 4, 1990, the Mayor of Philadelphia approved Bill No. 1050–A, which created § 9–204 of the Philadelphia Code to regulate sidewalk vending in "Center City" Philadelphia. The Ordinance defines "Center City" as the area from Vine Street to Bainbridge Street, between the Delaware River and the Schuykill River.

3) Regulations for the implementation of § 9–204 were enacted pursuant to § 8–407 of the Philadelphia Home Rule Charter in June of 1992.

4) Prior to the implementation of § 9–204, sidewalk vending throughout the City was regulated by § 9–205 of the Philadelphia Code. Under that ordinance, a Philadelphia sidewalk sales licensee could vend anywhere in the City where vending was not prohibited. While no vendor was licensed for any particular location, in practice many vendors set up at the same location every day.

5) Under § 9–204, a special license, assigning a particular location, is required to vend within the area known as Center City; the ordinance also limits the number of Center City vendors to 300.

6) Under § 9–204, vending locations in Center City are allocated according to how long a particular vendor has been vending at or near that location. Applicants who had vended at or near a particular location for at least two years prior to the enactment of the ordinance were ranked in order of seniority,

and ties among those so ranked were resolved by lottery. Section 9–204(8)(d)(.1).

7) Only people who held current sidewalk vending licenses and were currently vending in Center City were permitted to apply for the initial allocation of vending spots.

8) Applicants for Center City vending licenses were instructed to select five locations where they would be interested in vending. Section 9–204(4)(a)(.3).

9) The ordinance does not specify how notice is to be given of the new licensing requirements.

10) Applications for Center City Vending licenses became available at the Department of Licenses and Inspections ("the Department") on February 16, 1993. The deadline for filing Center City vending applications was March 12, 1993.

11) The Department advertised the new application procedure and the availability of applications in the Philadelphia Tribune, the Philadelphia Inquirer, and the Philadelphia Daily News on February 12, 1993.

12) Additionally, in September 1991, May 1992, and again in October 1992, inspectors from the Department conducted surveys to identify current Center City sidewalk vendors. The inspectors noted the names, addresses, type of goods, and license numbers of the vendors. They did not note the vendors' race. The inspectors were instructed to talk with all vendors. From those surveys the City compiled a list of 426 sidewalk vendors, to whom the City mailed applications and information regarding the new license on February 5, 1993. That list included the names of four plaintiffs: Daud El–Bakara, Adunagow Atunaku, Charles McKelvey, and Wahid Mateen.

13) Inspectors from the Department also distributed flyers to vendors on the street on three occasions between January and March 1993 to inform them of the new licensing procedure. The inspectors were not instructed to distribute applications. The inspectors were instructed to talk with all vendors.

---

1. Plaintiffs seek to represent a class of similarly situated street vendors in Philadelphia. The is-

sue of class certification is not yet before me.

14) Plaintiff Nadir Hassan overheard a Department inspector telling a Korean vendor about the new application procedure, but that inspector didn't talk with him. Plaintiff Khibeer Ali Raheem received an application from an inspector who was a friend, but other African American vendors told him that the inspectors passed them by.

15) Of the plaintiffs who filed timely applications under the new ordinances, Richard Lindsay, Wahid A. Mateen, and Nadir Hassan heard about the application procedure "through the grapevine" or from other vendors. Richard Lindsay also heard it discussed on a radio talk show. Khibeer Ali Raheem received an application from a Department inspector who was a friend of his.

16) The City did not mail notices or application forms to all holders of sidewalk vending licenses.

17) The City received 349 applications for Center City vending licenses. Fifteen were disqualified due to invalid tax numbers or sidewalk sales license numbers, leaving 334 qualified applicants for 300 spots.

18) About half of the applications came from vendors on the mailing list. Four plaintiffs submitted vending applications: Wahid Mateen and Charles McKelvey, who were on the City's mailing list; Khibeer Ali Raheem and Richard Lindsay, who were not. All of those plaintiffs were assigned locations, though not necessarily the ones they preferred.

19) The City does not keep records of the race or ethnic origin of sidewalk vending licensees. The Center City vending license application did not request information about the applicant's race or ethnic background, or about the type of goods that the licensee intended to sell, except as to whether or not the applicant would be selling food.

20) The allocation of vending locations was made entirely on the basis of seniority, as reflected by the Department records. Vendors who claimed more seniority than the City assigned them were given an opportunity to present evidence of their vending history to the Board of License and Inspection Review and ask the City to revise their seniority rating. Several vendors, including plaintiff Wahid A. Mateen, successfully challenged their seniority assignments through this process.

21) Any vendor who was dissatisfied with the outcome of his or her application could appeal to the Board of License and Inspection Review. Many vendors, of various ethnic and racial backgrounds, took advantage of this process.

22) Some applicants, with the Department's approval, swapped locations with other vendors.

23) There is now a waiting list. There are eight locations left to be assigned, which will be distributed by lottery.

24) Iskander Turner surveyed the Center City area by driving through the streets and counted between 27 and 42 African Americans vending on the streets before the implementation of § 9–204 in November of 1993. Mr. Turner did not talk to each vendor, and so could not testify as to how many of those African Americans had their own vending licenses, and how many were employed by others. Mr. Turner repeated his survey after November of 1993 and counted seven African American vendors in the Center City area.

25) In preparation for the evidentiary hearing, Lucille Howard, an administrative analyst employed by the Department to oversee the implementation of § 9–204, attempted to compile a list of African Americans who had Philadelphia sidewalk vending licenses. Since the Department does not record applicants' racial or ethnic background, her list was compiled from three sources: (a) the plaintiffs named in this action; (b) those vendors who submitted photos with their Center City vending applications; and (c) vendors she had dealt with personally and knew to be African American. That list contains 27 names; Ms. Howard admitted that there may be more African American vendors than those she was able to identify. Twenty of the vendors on Ms. Howard's list filed Center City vending applications; eighteen of those applicants received vending locations and two are on the waiting list.

26) The total number of Center City vendors was reduced from 426 before November

1993 to 300 after November 1993, a reduction of 30%. The number of African American vendors in Center City was reduced from between 27 and 42 before November 1993 to 18 after November 1993, a reduction of between 33% and 57%.[2] The implementation of § 9–204 has had a disproportionate effect on African American vendors.

27) The disproportionate effect did not result from the allocation of spaces. 292 out of 334, or around 87%, of the total qualified applicants for Center City licenses have been assigned spots. 18 out of 20, or 90%, of the African American applicants identified by Ms. Howard were assigned spots. Thus, African Americans who heard about the application deadline and had the necessary licenses to apply fared at least as well as the general population of applicants.

28) The City did not consider race in assigning vending locations. The only criterion used was seniority.

29) Many African American vendors work for other African American vendors for a period of time before starting out on their own; this is called "grandfathering". Other vendors might prevent a vendor from moving into a location where he has not "grandfathered".

30) Some of the plaintiffs have attempted to vend outside Center City and have been prevented from doing so by threats and violence by more established vendors in those areas.

31) There are a limited number of locations outside Center City where sidewalk vending is profitable.

## CONCLUSION OF LAW

■ In order to obtain a preliminary injunction, plaintiffs must show both a reasonable likelihood that they will prevail on the merits of their claim, and that they are likely to suffer irreparable harm in the absence of an injunction. *Bradley v. Pitts-*

*burgh Bd. of Educ.*, 910 F.2d 1172, 1175 (3d Cir.1990). The district court should also consider the probable effects of a preliminary injunction on unrepresented parties, as well as the public interest. *Id.*

■ I find that there was no City policy to treat the plaintiffs or other African American sidewalk vendors differently because of their race. Although the plaintiffs presented anecdotal testimony that some Department inspectors occasionally skipped African American vendors while handing out information about the new application procedure, there is no testimony that the City was aware of this or supported it. To the contrary, Gerald Richards, the inspectors' supervisor, testified that the inspectors were directed to speak to all vendors. The City may not be held liable in such circumstances. "[I]t is [only] when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978).

■ The evidence does indicate that the implementation of § 9–204 reduced African American vendors in Center City by a disproportionate percentage. The fact that a facially neutral law has a disproportionate adverse impact upon a racial minority does not, by itself, establish an equal protection violation. *Washington v. Davis*, 426 U.S. 229, 240, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). In order to show a substantial likelihood of success on their equal protection claim, the plaintiffs must also show that the City intended to discriminate against them on the basis of their race. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).

---

**2.** It is possible, as Ms. Howard testified, that there were more African American vendors who did not apply, as it is possible that there are more African Americans who successfully applied for Center City licenses than those she was able to identify. Thus, further discovery may show that there was a more severe impact on African Americans than these figures show, or that there was no disparate impact at all. The credible evidence before me at this stage does demonstrate a disparate impact.

■ In order to demonstrate that a facially neutral law was intended to have a discriminatory effect, the plaintiff must show not only that the decision maker was aware of the likely disparate impact, but that it selected or reaffirmed the chosen course of action at least in part "because of" and not merely "in spite of" its adverse effect. *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). If the adverse impact of the government decision is obviously predictable, that may create a strong inference that the disproportionate result was intended, but such a conclusion is not compelled. *Feeney*, 442 U.S. at 279 n. 25, 99 S.Ct. at 2296 n. 25.

Here, the disproportionate reduction in African–American vendors is not an obvious result of the restriction of Center City vending locations, nor of the methods used by the City to notify vendors of the application procedure. Several factors may have contributed to the fact that a lower percentage of African American Center City vendors applied for the special licenses: for instance, it may be more common for an African American vendor to work as a partner, or to "grandfather", rather than having his or her own license, making it less likely than an African American vendor would have the vending history needed to apply for a Center City license. Again, it may be that the methods of publication used by the City were less effective in reaching African Americans than in reaching vendors of other racial groups. Though the plaintiffs have demonstrated a disparate impact upon African American vendors, they have not linked that impact to any particular policy, action, or inaction on the part of the City. Moreover, they have not shown that the City knew of the likely disparate impact, or that it chose its course of action at least in part "because of" and not merely "in spite of" that adverse effect. The bare fact that the process resulted in a disproportionate reduction in African American vendors in Center City is not enough, by itself, to establish that the City intended to discriminate.

The plaintiffs have not presented me with sufficient evidence for me to find that they have a substantial likelihood of success on the merits of their equal protection claim. While further discovery may produce sufficient evidence to find for the plaintiffs on that claim, there is not enough at this point to merit a preliminary injunction.

Because I will deny the preliminary injunction for failure to demonstrate a likelihood of success on the merits, I will not reach the question of whether the plaintiffs have demonstrated that they face irreparable harm in the absence of an injunction.

### ORDER

**AND NOW,** this 10th day of February 1994, it is **ORDERED** that the plaintiffs' motion for preliminary injunction is **DENIED.**