Richard **LINDSAY**, et al., Plaintiffs,

v.

**CITY OF PHILADELPHIA,**
et al., **Defendants.**

Civ. A. No. 93–6650.

United States District Court,
E.D. Pennsylvania.

Aug. 23, 1994.

Malcolm W. Berkowitz, Philadelphia, PA, for plaintiffs.

Terrilyn R. Elliott, Asst. City Sol., Philadelphia, PA, for defendants.

### MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

The issue before me is whether defendant City of Philadelphia is entitled to summary judgment on the plaintiffs' claims that a recently implemented City ordinance limiting sidewalk vending in Center City Philadelphia violated their rights under the Fourteenth Amendment and Article I of the United States Constitution. I will grant summary judgment on the due process and impairment of contracts claims because the plaintiffs have not shown that they hold either a protected property interest or a contractual right in their customary vending locations. I will grant summary judgment on the equal protection claim because plaintiffs have presented no evidence that the City Ordinance was enacted with a racially discriminatory purpose or enforced in a racially discriminatory manner.

### I. Procedural History

On December 30, 1993, plaintiffs, a group of African–American sidewalk vendors, filed a complaint under 42 U.S.C. § 1983, on behalf of themselves and others similarly situated,[1] challenging the implementation of Philadelphia Code § 9–204. Plaintiffs sought a preliminary injunction, asserting that: 1) the

---

1. Plaintiffs never filed a motion for class certification as required by Federal Rule of Civil Procedure 23 and Local Rule 27, so this matter has not proceeded as a class action.

ordinance deprived them of property without due process of law; 2) the City's actions violated the constitutional prohibition against legislative impairment of contracts; and 3) the ordinance was both enacted with a racially discriminatory purpose and enforced in a racially discriminatory manner. I held an initial hearing on the motion, at which I heard argument but did not take evidence. I then issued *Lindsay v. City of Philadelphia,* 844 F.Supp. 229 (E.D.Pa.1994), (*"Lindsay I "*), in which I declined to issue a preliminary injunction on the grounds of plaintiffs' first two claims and ordered an evidentiary hearing on their equal protection claim.

After the evidentiary hearing, I made findings of fact and denied plaintiffs' motion for preliminary injunction because plaintiffs had failed to demonstrate that they had a reasonable likelihood of succeeding on their equal protection claim. *Lindsay v. City of Philadelphia,* 844 F.Supp. 224 (E.D.Pa.1994), (*"Lindsay II "*).

## II. Statement of Facts

Plaintiffs admit that they have failed to respond to the defendants' discovery requests and that they have produced no new evidence since the preliminary injunction hearing. I will, therefore, make my decision based on the evidence before me: my findings of fact from the hearing held on January 18, 1994, which are summarized here and set out in full in *Lindsay II,* 844 F.Supp. 224, 226–28, and the affidavits offered by defendant, which restate the testimony given at the hearing.

The plaintiffs are African–Americans who have engaged in the business of sidewalk vending in Center City Philadelphia for up to ten years. Most of them have held sidewalk vending licenses in their own names at one time or another, though few have done so for the entire time they have been vending.

On December 4, 1990, the Mayor of Philadelphia approved Bill No. 1050–A, which created § 9–204 of the Philadelphia Code to regulate sidewalk vending in Center City Philadelphia. That ordinance limited to 300 the number of vendors that could sell in the Center City area. The Ordinance narrowed the scope of the prior ordinance, Philadelphia Code § 9–205, which allowed holders of a sidewalk sales license to vend anywhere in the City. Philadelphia's Department of Licenses and Inspections (the "Department") is responsible for implementing § 9–204.

Under § 9–204, vending locations in Center City were allocated according to the length of time that a vendor, then holding a valid license, had been vending at or near that location. The Ordinance did not specify how notice was to be given of the new licensing requirements. Applications for Center City vending licenses became available and were advertised beginning on February 16, 1993. The deadline for filing Center City vending applications was March 12, 1993.

In September 1991, May 1992, and again in October 1992, inspectors from the Department conducted surveys to identify current Center City sidewalk vendors. The inspectors noted the names, addresses, type of goods, and license numbers of the vendors. Affidavit of Lucille Howard at ¶ 3; Affidavit of Gerald L. Richards, Jr. at ¶ 5. The inspectors were instructed to talk with all vendors. From those surveys the Department compiled a list of 426 sidewalk vendors, to whom the Department mailed applications and information regarding the new license on February 5, 1993. The Department did not mail notices or application forms to all holders of sidewalk vending licenses.

The Department received 349 applications for Center City vending licenses. Fifteen were disqualified due to invalid tax numbers or sidewalk sales license numbers, leaving 334 qualified applicants for 300 spots.

The Center City vending license application did not request information about the applicant's race or ethnic background, or about the type of goods that the licensee intended to sell, except as to whether or not the applicant would be selling food. The Department allocated vending locations solely on the basis of seniority, as reflected by the Department records. Affidavit of Lucille Howard at ¶ 7.

In an informal survey of the Center City area by one of the plaintiffs, between 27 and 42 African–Americans were counted vending on the streets before the implementation of

§ 9–204 in November of 1993. How many of those African–Americans had their own vending licenses, and how many were employed by others is unknown. The survey was repeated after November of 1993 and seven African–American vendors were observed vending in the Center City area.

In preparation for the evidentiary hearing, Lucille Howard, an administrative analyst employed by the Department to oversee the implementation of § 9–204, attempted to compile a list of African–Americans who had Philadelphia sidewalk vending licenses under § 9–205. That list contains 27 names; Ms. Howard admitted that there may be more African–American vendors than those she was able to identify. Twenty of the vendors on Ms. Howard's list filed Center City vending applications; eighteen of those applicants received vending locations and two are on the waiting list.

The total number of Center City vendors was reduced from 426 before November 1993 to 300 after November 1993, a reduction of 30%. The number of African–American vendors in Center City was reduced from between 27 and 42 before November 1993 to 18 after November 1993, a reduction of between 33% and 57%. The implementation of § 9–204 has had a disproportionate effect on African–American vendors.

The disproportionate effect did not result from the allocation of spaces. 292 out of 334, or around 87%, of the total qualified applicants for Center City licenses have been assigned spots. 18 out of 20, or 90%, of the African–American applicants identified by Ms. Howard were assigned spots. Thus, African–Americans who heard about the application deadline and had the necessary licenses to apply fared at least as well as the general population of applicants.

Applicants who were not awarded Center City vending licenses but who still have current general vending licenses may vend outside Center City.

## CONCLUSIONS OF LAW

To succeed on a motion for summary judgment, the moving party must establish that no genuine issues of material fact remain in dispute and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists if there is sufficient evidence for a reasonable fact-finder to reach a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Where there is a complete failure of proof concerning an essential element of the non-moving party's case the moving party is entitled to a judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. Within this context, the evidence must be viewed in the light most favorable to the non-moving party. *Mellon Bank Corp. v. First Union Real Estate Equity and Mort. Invest.,* 951 F.2d 1399, 1404 (3d Cir.1991).

In their complaint, plaintiffs make three claims: 1) that they have been deprived of property without due process; 2) that the City's actions in limiting the scope of their licenses before the end of the license term violates the constitutional prohibition against legislative impairment of contracts; and 3) that the City Ordinance was both enacted with a racially discriminatory purpose and enforced in a racially discriminatory manner. Defendant is entitled to summary judgment on all claims.

### 1. Plaintiffs' Due Process Claim

To survive summary judgment in a claim for deprivation of property without due process the complaining party must: 1) have had a protected property interest, and 2) have been deprived of that protected interest without sufficient process. *Mims v. Shapp,* 744 F.2d 946, 949 (3d Cir.1984).

 A plaintiff alleging a constitutionally protected property interest must show more than an unsubstantiated expectation of benefit. *Carter v. City of Philadelphia,* 989 F.2d 117, 120 (3d Cir.1993). A license, once issued and relied upon, may be a constitutionally protected property interest which cannot be revoked by the government without due process. *Venrod Corp. v. Secretary of the Treasury of the Commonwealth of Puerto Rico,* 704 F.Supp. 21, 24 (D.P.R.1989). Plaintiffs here do not contend that their li-

censes have been revoked, but only that they have been removed from their customary vending locations. The plaintiffs' licenses, issued under Philadelphia Code § 9–205, gave them a protected interest vending, but did not entitle them to do so in any particular location. Section 9–205 creates a general license to vend anywhere within the City limits, except where prohibited by existing *or future* ordinances. Philadelphia Code § 9–205(p). The new ordinance restricted vending in Center City while continuing to permit vending elsewhere; this action was consistent with the terms of the license granted under § 9–205. Because the plaintiffs do not have a protected property interest in their customary vending locations and have not lost their right to vend elsewhere in the City, they have no claim for deprivation without due process. Defendants are entitled to summary judgment as a matter of law on plaintiffs' due process claim.

## 2. Plaintiffs' Impairment of Contracts Claim

■ Article I, § 10 of the United States Constitution prohibits legislative impairment of a government's existing contractual obligation. The facts regarding plaintiffs' contract claim are not in dispute; the sole issue before me is whether the unrestricted vending licenses created by § 9–205 of the Philadelphia Code form a contract between the plaintiffs and the City. In other words, do the licenses created by § 9–205 afford plaintiffs a right to vend in Center City that cannot be impaired by subsequent City regulation?

Absent "clear, unequivocal language to the contrary, an ordinary business license is not considered to be a contract between a government and private parties." *Kennedy v. Hughes,* 596 F.Supp. 1487, 1495 (D.Del.1984). Although a municipality may bargain away its right to control its streets, it will not be found to have done so unless it has bound itself by clear and unequivocal terms. *City of St. Louis v. United Rys. Co.,* 210 U.S. 266, 273–74, 28 S.Ct. 630, 632, 52 L.Ed. 1054 (1908). In issuing the plaintiffs licenses under § 9–205, the City did not surrender its right to restrict vending in Center City.

Section 9–205 neither states an inalterable right to vend anywhere in Philadelphia, nor entitles a vendor to establish and preserve a customary vending location. In fact, that Ordinance specifically states that the licensee is prohibited from vending in a long list of enumerated locations "or any other location which the [City] Council shall from time to time ordain." § 9–205(p). The plaintiffs' licenses, therefore, do not give them an enforceable contractual right to continue to vend in Center City, and the Contracts Clause of the Constitution does not forbid the subsequent limitation of those licenses.

## 3. Plaintiffs' Equal Protection Claim

Plaintiffs brings two claims under 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment: a) that § 9–204 was enacted with the intent to reduce the number of African–American street vendors in Center City; and b) that the ordinance was deliberately implemented in a manner designed to deny notice of the application process to African–American vendors and deny them access to the space allocation process.

### A. The claim that § 9–204 was enacted with a discriminatory intent

■ Section 9–204 is not discriminatory on its face, but has had a disproportionate effect on African–American sidewalk vendors. A facially neutral law which disproportionately and adversely affects a racial minority does not, of itself, violate the Equal Protection Clause. *Washington v. Davis,* 426 U.S. 229, 240, 96 S.Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976). To survive summary judgment on their claim that the ordinance was designed to reduce the number of African–American vendors in Center City, therefore, plaintiffs must show that a reasonable fact-finder could determine that the City was aware of the likely disparate impact on African–Americans and that it selected or reaffirmed the ordinance at least in part because of and not merely in spite of the expected result. *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979).

Plaintiffs have produced no evidence, either at the preliminary hearing or since the

hearing, that City officials knew or should have known § 9–204 would exclude African–American vendors in disproportionate numbers, or that the Ordinance was enacted for that reason. I will, therefore grant summary judgment on this claim because plaintiffs have not met their burden of showing that the Ordinance was intended to have a disparate impact.

**B. The claim that the Department deliberately implemented § 9–204 so as to exclude African American vendors from Center City**

 In order to maintain their § 1983 claim that the Ordinance was enforced in a racially discriminatory manner, plaintiffs must present enough evidence to allow a reasonable fact-finder to determine that the plaintiffs were treated differently than other vendors who are not African–American, and that the different treatment was directed or approved by the City's "lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978).[2] A municipality cannot be held liable for its employees' unconstitutional acts unless those actions were taken pursuant to municipal policy, custom or usage. *Id.*

The plaintiffs presented some anecdotal evidence that unnamed inspectors from the Department skipped over African–American vendors when distributing flyers about the new license. The plaintiffs have presented no evidence that these episodes reflected a City policy to discriminate against African–American street vendors. The City, on the other hand, has produced testimony and affidavits which demonstrate that there was no discrimination by the City in the enforcement of the Ordinance. Gerald Richards, the supervisor of the inspectors who allegedly skipped over African–American vendors, testified at the preliminary injunction hearing and by affidavit that the inspectors were directed to speak with all vendors. Lucille Howard, the analyst who oversaw the space allocation procedure, testified at the hearing and by affidavit that the allocations were made solely on the basis of seniority. Plaintiffs have failed to challenge this evidence. Because the Department may not be held liable under § 1983 without evidence that there was a Department policy or custom of discrimination, the defendants are entitled to summary judgment on the plaintiffs' equal protection claim.

### ORDER

**AND NOW,** this 23rd day of August, 1994, upon consideration of the defendants' motion for summary judgment and plaintiffs' response, it is **ORDERED** that defendants' motion for summary judgment is **GRANTED** as to all of the plaintiffs' claims.

---

2. Plaintiffs have sued only the City and Bennett Levin, P.E., Commissioner of the Department of Licenses and Inspections. Since the plaintiffs do not allege any specific wrongdoing by Levin himself, this action can only be against Levin in his official capacity as Commissioner. Therefore the claim against Levin will also fail if the plaintiffs cannot satisfy their burden under *Monell.*