# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Wlodzimier Ziemlewicz, : 
              Appellant : 
              : 
         v. :    No. 1088 C.D. 2015 
              :    Submitted: February 8, 2016 
Board of License and Inspection : 
Review : 

BEFORE:    HONORABLE ROBERT SIMPSON, Judge 
               HONORABLE P. KEVIN BROBSON, Judge 
               HONORABLE MICHAEL H. WOJCIK, Judge 

OPINION NOT REPORTED

**MEMORANDUM OPINION**
**BY JUDGE SIMPSON**            **FILED: March 3, 2016**

In this license revocation case, the City of Philadelphia (City) Board of License and Inspection Review (Board) affirmed the revocation of Wlodzimier Ziemlewicz's (Vendor) sidewalk vending license to operate a food cart. The Board revoked his license based on his alleged improper transfer or assignment of his license to Sardar Ali (Ali), who operated and managed the cart. Vendor appeals from an order of the Court of Common Pleas of Philadelphia County (trial court)[1] affirming the decision of the Board. Vendor argues there is no substantial evidence to support the finding that he transferred or assigned his license. He contends Ali acted with his authorization, showing an agency relationship, not an assignment. Upon review, we affirm.

---

[1] The Honorable Nina Wright-Padilla presided.

## I. Background

Section 9-204 of the Philadelphia Code (Code), which went into effect in the early 1990s, regulates sidewalk vending in Center City Philadelphia (Ordinance). "Center City" is defined as the area from Vine Street to the south side of Bainbridge Street, between the Delaware River and the Schuylkill River. See Section 9-204(1)(b) of the Code. Previously, Section 9-205 of the Code allowed a sidewalk sales licensee to vend anywhere in the City where vending was not expressly prohibited. The Ordinance now requires a special license assigning a particular location within Center City. It also reduced the number of assigned locations from 429 to 300.

In September 1993, Vendor obtained a license to vend at location #74 on 10th Street, between Chestnut and Sansom Streets under License No. 354894 (License). In 2013, the City's Department of Licenses and Inspections (Department) conducted a review of vendor records. As a result of that review and on-site inspections, the Department determined Ali was unlawfully operating at Vendor's assigned location, and it issued a notice of intent to revoke the License (Notice). Reproduced Record (R.R.) at 103a. The Notice specified the grounds for revocation as a violation of Section 9-204(3)(f) of the Code, which prohibited assignment or transfer of a license. The Notice advised that unless Vendor fully complied with legal requirements within 30 days, his License would be revoked. Vendor appealed to the Board, arguing he did not assign or transfer the License.

The Board held a hearing where the Department presented the testimony of Maureen Blaney, Manager of its Vending Unit (Manager). Manager

testified regarding the regulations and license requirements applicable to sidewalk vending licensees and her investigation into Vendor's operations.

During her 2013 review of tax numbers for Center City vendors, Manager noticed Vendor's tax account pertaining to the cart was closed. Vendor did not pay his tax accounts (net profits or business privilege) from 2008 through 2011. Also, his License was delinquent. She sent an inspector to the cart who reported the cart did not show current licenses. As a result, the cart was shut down.

The tax records stated Vendor "closed down business in 2008." R.R. at 76a. However, during that period, Ali continued to operate the cart and renewed the License under Vendor's name in 2010. On January 25, 2013, Vendor reopened the tax accounts retroactive to 2011, "when he re-started his bus[iness] again." Id. Manager emphasized that the records dated after 2006 did not show Vendor was at the cart for any of the inspections, listing Ali as the person in charge.

In addition, Manager testified each vendor is required to have a "commissary" license for the location where vendors store and clean their carts. R.R. at 33a-34a. Manager explained the commissary license may only serve a single cart. Id.; Bd. Op., 3/25/15 Finding of Fact (F.F.) No. 6. When Manager searched the records for a commissary license corresponding to Vendor's cart, she learned Vendor's commissary license was delinquent since 2010. However, Ali held a commissary license in his name since 2004. As the vendor should hold the commissary license, she looked into Ali's tax records.

3

Manager's investigation revealed that Ali engaged in the business under Vendor's license. Ali had his own tax account number for payment of net profits tax, and a business privilege license, but not his own vending license. R.R. at 37a. If Ali were only an employee, he would not need these licenses or tax accounts. Ali renewed all licenses and certifications, including health inspection licenses in 2012, 2013 and 2014. In addition, while the cart was allegedly "closed" by Vendor, Ali paid with his own check to renew the license in 2010. R.R. at 70a ("It says his name on the check, the check number and the name. And they can pay cash for a license, so if he gave them cash – he could have brought the cash in.").

Vendor testified regarding his operation of the business. He worked the cart with his wife starting in 1993. He stopped in 2008 after his first heart attack. He did not operate the cart from 2008 to 2011 as the business was "closed" then. R.R. at 54a. He returned to the business in 2012, but he did not work the cart as he had a second heart attack. His wife could not work the cart because she has a cleaning business. He testified "[his wife] hired an employee," Mohammed Iqbal, in 2012. Id. at 50a. Iqbal also worked for his wife's cleaning business.

Regarding his relationship with Ali, Vendor explained "Ali helped" by taking the cart for inspection "[b]ecause he know – he work for my wife, Theresa." R.R. at 52a. Significantly, he did not produce any records showing that Ali was his employee, and he did not refer to Ali as his employee. He repeated that he did not pay Ali "because he work [sic] for my wife." Id. Vendor testified others who "helped" him were also his wife's employees and he did not pay them. Id. at 51a-54a. Also, Ali opened a wage account to pay Iqbal in 2012. Id. at 55a.

4

There was no record of a wage account before then. Notably, Vendor initially stated the cart was Ali's, but, when corrected by counsel, he stated it was his. Id. at 53a ("Whose cart? Ali cart"). As to business operations, Vendor was unclear that Ali renewed the License. First, he testified the License was not renewed in 2010. Then, he revised his testimony, stating he thought his wife gave Ali the money to renew the License. Id. at 57a.

Ali also testified for Vendor. He confirmed he worked for Vendor's wife for four or five years. When asked why he helped Vendor, he replied he did so when Vendor's wife asked. He explained he used to work another food cart at another location that is now closed. He explained he had a commissary license in his name, and he had to obtain a business privilege license to get the commissary license. R.R. at 64a. He also confirmed he paid net profits tax. Id. He had a "Serve Safe Certification" because he works part-time in a restaurant. Id. at 63a.

Ultimately, the Board affirmed the City's revocation. The Board found the testimony of Vendor and Ali not credible. The Board credited Manager's testimony regarding Ali's control over and responsibility for the business. The Board found Ali was not an employee of Vendor. However, it found Ali operated the licensed location. Vendor appealed to the trial court.

Based on the certified record and after oral argument and briefing, the trial court affirmed the Board. At the trial court's direction, Vendor filed a statement of the errors complained of on appeal setting forth a single issue: "the record did not support a finding that the [License] was unlawfully transferred or

assigned." Tr. Ct., Slip Op., 8/24/15, at 5. In response, the trial court filed its Pa. R.A.P. 1925(a) opinion. The trial court concluded the record contained substantial evidence to support the Board's finding. Vendor appeals from that decision.

## II. Discussion

On appeal to this Court,[2] Vendor asserts the trial court committed reversible error when it affirmed the Board because the record lacks substantial evidence that Vendor transferred or assigned the License. Vendor argues the Code does not prohibit hiring employees to handle operations, or to act as agents or managers of the license holder. Vendor contends Ali acted as his agent.

The City responds that the trial court properly affirmed the License revocation because substantial evidence supports revocation. The City argues the record reflects Ali unlawfully operated Vendor's cart. That Ali held the requisite licenses and paid the applicable taxes for the cart's operation shows a transfer of the License. The City emphasizes Vendor admitted he closed the business from 2008 through 2011; however, Ali continued to operate the cart during that period. In contrast to the evidence showing Ali's control of the business, there is no evidence showing any control by Vendor over the business.

---

[2] Our review of a local agency decision where the trial court does not receive additional evidence is limited to determining whether constitutional rights were violated, an error of law was committed, whether the necessary findings were supported by substantial evidence, and whether the procedures of the local agency were contrary to statute. 2 Pa. C.S. §754(b); Mulberry Mkt., Inc. v. City of Phila., Bd. of License & Inspection Review, 735 A.2d 761 (Pa. Cmwlth. 1999).

"Government licenses to engage in a business or occupation create an entitlement to partake of a profitable activity, and therefore, are property rights." City of Phila., Bd. of License & Inspection Review v. 2600 Lewis, Inc., 661 A.2d 20, 22 (Pa. Cmwlth. 1995) (remanding to ensure due process prior to license revocation; citing Young J. Lee, Inc. v. Dep't of Revenue, Bureau of State Lotteries, 474 A.2d 266 (Pa. 1983)). Pennsylvania courts recognize a sidewalk vending license as a property right. See Scott v. City of Pittsburgh, 903 A.2d 110 (Pa. Cmwlth. 2006); see also Lindsay v. City of Phila., 863 F. Supp. 220 (E.D. Pa. 1994) (distinguishing property right in license to vend from a license to vend in a particular location as required by Ordinance). Thus, a local agency must provide a licensee with notice of the pending revocation and an opportunity to be heard on that revocation. 2600 Lewis, Inc. Here, the Notice stated improper transfer or assignment of the License and unlawful operation by Ali as grounds for revocation.

**A. Ordinance**

The Ordinance provides: "It shall be unlawful for any person to engage in the business of a sidewalk vendor within Center City without first obtaining a license pursuant to this Section from the Department." Section 9-204(3)(f) of the Code (emphasis added). To qualify for a vending license, an applicant must have a "current and valid Pennsylvania sales tax identification number, and [a] current and valid Philadelphia commercial activity license number." Section 9-204(4)(a)(.4), Bill No. 110758 (approved December 21, 2011, effective May 1, 2012). Pertinent here, the Ordinance states "[e]very license shall be non-assignable and non-transferable." Section 9-204(3)(f) of the Code.

7

The Ordinance defines "sidewalk vendor" as "any person who exhibits, displays, offers for sale or sells any food, beverages, goods, wares or merchandise from any stand while on the sidewalk ...." Section 9-204 of the Code (definitions). A pushcart is a "stand" that must be licensed because it is "used to display, exhibit, carry, transport, store, offer for sale, or sell any food [or] beverages ... upon the sidewalk." Id. A food cart qualifies as a "food establishment" regulated by the Health Code. See Section 6-102 of the Code. All food establishments must have a commissary license. Section 6-301(2) of the Code.

Our Supreme Court follows the principles set forth in the Statutory Construction Act when construing local ordinances. Phila. Eagles Football Club, Inc. v. City of Phila., 823 A.2d 108 (Pa. 2003). This includes interpreting terms in accordance with their common and approved usage. Id.; 1 Pa. C.S. §1903. "Furthermore, the courts of this Commonwealth generally use dictionaries as source material to determine the common and approved usage of terms." Phila. Eagles Football Club, 823 A.2d at 127 n.31 (citing Love v. Phila., 543 A.2d 531 (Pa. 1988)).

The revocation of Vendor's License is predicated on a violation of the Ordinance, specifically, that he assigned or transferred the business to Ali. The meaning of "assign" or "transfer" in the licensure context is relevant to our review.

Black's Law Dictionary defines "assign" as "to convey; to transfer rights or property." BLACK'S LAW DICTIONARY 135 (9th ed. 2009). "Transfer" is defined as "1. [t]o convey or remove from one place or one person to another; to

8

pass or hand over from one to another, esp[ecially] to change over the possession or control of. 2. [t]o sell or give." Id. at 1636. Both definitions include the phrase "to convey" which means "to transfer or deliver (something, such as a right or property) to another, esp[ecially] by deed or other writing; esp[ecially] to perform an act that is intended to create one or more property interests, regardless of whether the act is actually effective to create those interests." Id. at 383 (emphasis added). Accordingly, a party's action may show a transfer despite the lack of actual authority to effectuate a legal transfer.

With these principles in mind, we consider whether substantial evidence supports the Board's finding that Vendor transferred or assigned the License to Ali so that Ali was actually engaged in the business.

**B. Substantial Evidence**

"In a substantial evidence inquiry[,] we simply inquire whether there is such relevant evidence of record which a reasonable person might accept as adequate to support a conclusion." Mulberry Mkt., Inc. v. City of Phila., Bd. of License & Inspection Review, 735 A.2d 761, 767 (Pa. Cmwlth. 1999). Where the party bearing the burden of proof relies on "circumstantial evidence, the evidence 'must be adequate to establish the conclusion sought and must so preponderate in favor of that conclusion as to outweigh in the mind of the factfinder any other evidence and reasonable inferences … which are inconsistent.'" Shrader v. Bureau of Prof'l & Occ. Affairs, 673 A.2d 1, 2 (Pa. Cmwlth. 1995) (citation omitted). It is our duty to determine whether the Board's inferences are reasonably based on the record. Further, in reviewing the record, a court must view the evidence in the

9

light most favorable to the prevailing party. Phila. Civil Serv. Comm'n v. Ross, 595 A.2d 200 (Pa. Cmwlth. 1988).

It is well-established that "it does not matter that there is evidence in the record which supports a factual finding contrary to that made by the factfinder, rather, the pertinent inquiry is whether there is any evidence which supports the factfinder's factual finding." Mulberry Mkt., 735 A.2d at 767. Moreover, "[i]t is solely for the factfinder to assess credibility[,] to resolve conflicts in the evidence … [and] to determine what weight to give to any evidence." Id.

Vendor takes the position that Ali was not "engaged in the business" unlawfully. He emphasizes that the Ordinance allows a single person to hold two licenses, at two different assigned locations. Because a single person may hold two licenses in two separate locations, the Ordinance contemplates that one who "engages in the business" of a sidewalk vendor may enlist employees or agents to operate the pushcarts. He maintains Ali merely performed work on Vendor's behalf and managed the administrative side of the business, such as with licenses and inspections. Notwithstanding Vendor's emphasis that Ali was acting as his agent, the record does not support this contention.

There is no writing here expressing a principal-agent relationship; therefore, Vendor invokes the concept of common-law agency. The three elements of common-law agency are: "[1] the manifestation by the principal that the agent shall act for him[;] [2] the agent's acceptance of the undertaking[;] and[,] [3] the understanding of the parties that the principal is to be in control of the

10

undertaking." Am. Fed'n of State v. Pa. Labor Relations Bd., 111 A.3d 1140, 1147 (Pa. 2015) (quoting Scott v. Purcell, 415 A.2d 56, 60 (Pa. 1980)).

From our review of the record, there is no evidence establishing Ali was serving as Vendor's agent. Ali had apparent control of the business because he managed and operated the business on a daily basis. There was no evidence that Vendor controlled or managed Ali. The record shows Vendor did not pay Ali for his services or direct Ali on behalf of the business. R.R. at 52a.

Notably, neither Ali nor Vendor testified that Vendor exercised any control over Ali. Regardless, the Board did not credit the testimony of either Vendor or Ali. The Board noted their testimony was inconsistent with the records and with the credible testimony of Manager.

Vendor's argument that he had a master-servant or employer-employee relationship with Ali is also unsupported by the record. The record shows only an employment relationship between Ali and Vendor's wife. Id. at 54a-55a. In fact, Vendor had no employees working for the business until 2012. That is evident from the fact that he paid no wage taxes and had no account for wage taxes until Ali set it up in 2012. Id. at 55a.

Viewed as a whole, the record contains substantial evidence that Ali was engaged in the sidewalk vending business under Vendor's License. Ultimately, the Board's determination that Vendor transferred his License was based on several factors.

First, Ali operated the business under the License during the period (2008-2011) when Vendor closed the business and his tax accounts were inactive. R.R. at 54a. There is no evidence that Vendor exercised an interest under the License after 2008. Vendor maintained the business was "closed" from 2008-2011, and he returned to the business in 2012. Id. at 54a-55a. Yet, the evidence is clear that the cart remained in operation, and Ali renewed its license in 2010, while Vendor thought he closed the business and had nothing to do with it for over 3 years.

Second, there is no evidence that Vendor received revenue from the business when Ali continued to operate it. Significantly, Vendor's tax accounts were closed from 2008 until he went to the tax office in 2013 to reopen the accounts. Id. at 31a, 66a, 76a. That means Vendor had no account for, and did not pay, net profits taxes[3] in 2008, 2009, 2010, 2011, or 2012, until he brought the account current. Also, when Vendor reopened his tax account in 2013, it was only retroactive to 2011. Id. at 76a. Thus, Vendor claimed no financial or legal responsibility for operation of the business between 2008 and 2011, which continued under Ali.

Third, there is no dispute that Ali operated the business and reaped the benefits. Importantly, Ali paid net profits taxes instead of wage taxes. Id. at 64a. That shows Ali received the revenues, paid the expenses and kept the profits of the business. As a result, Ali had ultimate financial responsibility for the business.

---

[3] Net profits tax is paid on the "net gain from operation of a business … after provision for all allowable costs and expenses incurred in the conduct thereof." Section 19-1501 of the Code.

Fourth, Ali maintained the relevant licenses and inspections required for compliance with the Ordinance.  Id. at 59a, 63a, 64a.  Vendor did not maintain the commissary license, which was required to be in the name of the vending license holder.  Id. at 43a, 56a.  Instead, Ali maintained the commissary license in his name.  Id. at 62a.  Plus, Ali renewed the License in 2010, using his own check, R.R. at 56a, and he renewed it again in 2013, ostensibly on Vendor's behalf.

Also indicating that Ali was "engaged in" the vending business, Ali held a business privilege license.  Ali testified he had his own business privilege license because he needed such a license in order to hold a commissary license.  Id. at 64a.  However, there is no evidence that he had his own business.  Instead, he related these licenses to his alleged employment to Vendor.  Id.

Additionally, because Ali was not an employee or the license holder, his operation of the cart was improper.  The Ordinance does not permit non-employee agents to operate carts.  Indeed, Section 9-204(5) of the Code requires any licensee *or his employee* to carry a license on his person.  Ali was neither.  Yet, Ali was the only person present for the City's Health Department inspection of the cart in 2010, and from 2010 to 2012.  R.R. at 31a, 45a.  The Department had no record of Vendor being present for an inspection or operating the cart after 2006.  Id. at 37a-38a.

These facts establish Vendor, in effect, transferred his License to Ali.  Because these facts are supported by substantial evidence, we affirm the trial court, which affirmed the Board's revocation.

13

Public policy also favors this result. The Department must be able to revoke licenses when a licensee allows another to operate his business. Otherwise, the City may be unable to determine how and to whom to allocate limited licenses, and the actual operator may be shielded from scrutiny in the licensed activity. By allowing another to use his License and operate his business, Vendor thwarted the City's oversight and mechanism of accountability underlying the licensure process.

### III. Conclusion

Based on the foregoing, we affirm.

ROBERT SIMPSON, Judge

14

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Wlodzimier Ziemlewicz,    :
       Appellant  :
          :
    v.      :  No. 1088 C.D. 2015
          :
Board of License and Inspection :
Review       :

# **O R D E R**

**AND NOW**, this 3rd day of March, 2016, the order of the Court of Common Pleas of Philadelphia County is **AFFIRMED**.

            _____
            ROBERT SIMPSON, Judge