**Daniel ANTONELLI, et al., Plaintiffs,**

v.

**State of NEW JERSEY,
et al., Defendants.**

**Civ. No. 00–5725 (WHW).**

United States District Court,
D. New Jersey.

March 31, 2004.

⚗️197

Robert J. Rohrberger, Fox & Fox, Esqs., Livingston, NJ, for Plaintiffs.

Barbara E. Thawley, Washington, DC, Barbara J. Stoop, Trenton, NJ, for Defendants.

Douglass L. Derry, Farrell & Thurman, PC, Skillman, NJ, for Plaintiffs/Defendants.

## OPINION

WALLS, District Judge.

Defendants State of New Jersey and the United States each bring a Motion for Summary Judgment. Plaintiffs bring a Cross–Motion for Summary Judgment. Defendants also bring a Motion to Strike the October 20, 2003, Declaration of Robert J. Rohrberger. Defendants' Motions for Summary Judgment are granted. Plaintiffs' Cross–Motion for Summary Judgment is denied. The Motion to Strike is dismissed as moot.

## FACTS AND PROCEDURAL BACKGROUND

In 1977, the United States filed its Complaint in *United States v. New Jersey,* alleging that the State of New Jersey and twelve cities also named as defendants were, among other things, engaged in a pattern or practice of employment discrimination by denying equal employment opportunity to black and Hispanic applicants for entry-level firefighter positions in violation of Section 707 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–6 ("Title VII"). A Consent Decree resolving the United States's claims was approved and entered by the Court in 1980. That Consent Decree required the State and cities named to undertake affirmative action to increase the proportion of black and Hispanic personnel in their fire departments. In 1990, in settlement of a dispute between the United States and the State concerning the State's entry-level firefight-

er exam, a Supplemental Consent Order was approved and entered by the Court.

In this action, Plaintiffs challenge the administration and scoring of the entry-level firefighter exam administered by the New Jersey Department of Personnel ("NJDOP") in 1999 and 2000 (the "1999 exam"). The three components of the 1999 exam were: Part I, a multiple-choice cognitive test designed to assess the ability to read and perform basic math; Part II, a biographical questionnaire (the "biodata component"), part of which was used to assess teamwork skills; and Part III, a physical performance test ("PPT").

The biodata component was designed by Dr. Terry Mitchell, who first conducted a job analysis to determine the characteristics of effective firefighters. He identified three broad categories of characteristics to be used in evaluating candidates: physical performance, cognitive performance, and teamwork. He used this analysis along with further research to develop the biodata component. Dr. Mitchell's understanding at the time was that the *entire* biodata component, including the physical, cognitive, and teamwork questions, would constitute one-third of the overall exam score; he had developed the component with that idea in mind.

Plaintiffs allege that as of July 1999, the NJDOP had decided to use the entire biodata component as one-third of the exam score (i.e., as Part II), but that in May 2000—after the administration of the exam—NJDOP decided to use the teamwork data of that component only. Defendants dispute this account. They point out that at a hearing on June 15, 1999, before the exam was given, Defendants discussed the three components of the exam with then-District Judge Politan. They told the Court that the biodata component as writ-

ten measured physical, cognitive, and teamwork abilities, but that only the teamwork data would be used as part of a candidate's overall score. (Hr'g Tr. of 6/15/99, at 9.) The principal dispute at the hearing was what the relative weights of the three components of the exam should be. The Court required the State and the United States to "attempt to agree on the use of *the biodata instrument comprising the teamwork component* by July 15, 1999." (Order of 7/30/99 in *United States v. New Jersey*, emphasis added.)[1] On July 30, 1999, Judge Politan ordered that "[t]he cognitive, teamwork and physical performance components of the entry-level firefighter examination developed by the State of New Jersey shall be scored, and the applicants' score on each of the three components shall constitute one-third of their total score for the purposes of ranking." (*Id.*)

The written components of the exam (Parts I and II) were administered in November 1999, and the physical component was administered in early 2000. The same exam was administered to all candidates and the exams were all scored using the same scoring key. All candidates were required to achieve the same *minimum* cut-off score on each exam component, and all candidates who passed each component of the exam were ranked according to a final score with each component equally weighted.

The NJDOP set the *minimum* cut-off scores for each component after the exam was administered. Before doing so, it analyzed whether various cut-off scores would have an adverse impact on candidates on the basis of race or sex. In doing so, the NJDOP was guided by the "four-fifths rule." Taken from the *Uniform Guide-lines on Employee Selection Procedures,* 28 C.F.R. § 50.14, this rule holds that a selection rate for any race or sex that is greater than four-fifths of the rate of the group with the highest rate is generally regarded by federal enforcement agencies as evidence of no adverse impact. The cut-off scores established by the NJDOP resulted in a passing rate, in comparison to the passing rate of white candidates, of 84.4% for black candidates and 83% for Hispanic candidates. Defendants assert that the adverse impact analysis did not affect the setting of the cut-off score for Part II, as there was no adverse impact almost anywhere along the range of scores. Plaintiffs dispute this, claiming that the cut-off scores were determined solely on the basis of minimizing adverse impact.

In June 2000, the State filed a Motion for court approval of its use of the 1999 exam to certify firefighter candidates. In support of the Motion, the State stated that one of its main goals in the development and administration of the exam was to minimize adverse impact on minorities. The State explained what the cut-off scores were and how they were determined. Judge Politan granted the Motion, which authorized the NJDOP to establish firefighter eligibility lists based on the results of the 1999 exam. (Order of 6/29/00 in *United States v. New Jersey*.)

In January 2000, the NJDOP had informed Dr. Mitchell that, in addition to providing a score for total biodata for each candidate, he should prepare separate scores for the subparts of the biodata component (physical performance, cognitive performance, and teamwork). The NJDOP used this information to prepare

---

1. The date in the Order is earlier than the date of its entry because it was based on a proposed order submitted after the June 15, 1999, hearing, but was not signed until July 30.

the analysis described above. Plaintiffs allege that not until May 2000, after it had done this analysis, did the NJDOP decide to use only the teamwork questions from the biodata component as the score for Part II of the exam. The NJDOP disputes this, maintaining that while it set the cut-off scores after the administration of the exam, it made the decision to use only the teamwork questions beforehand. Dr. Mitchell objected to the proposed use of the teamwork questions only and refused to write a report validating the results of the scoring of Part II.

When the candidates received their final scores, they also received a pamphlet explaining how Part II was scored. It said that although the biodata component was designed to test physical performance, cognitive performance, and teamwork, "the questions relating to cognitive and physical skills were not graded, since these skills were measured by the other two parts of the firefighter test." The pamphlet also explained that candidates would not be able to review the questions and scoring key to Part II because they were proprietary and to maintain test security.

This action arises from three actions styled *Antonelli v. New Jersey, Deegan v. New Jersey,* and *FMBA v. New Jersey.* In November 2000, several months after the establishment of new firefighter eligibility lists that resulted from the exam, the FMBA and the Antonelli Plaintiffs attempted to intervene in *United States v. New Jersey* to allege essentially the same claims they now allege in these consolidated actions. Their Motions to Intervene were denied. Thereafter, Plaintiffs filed three separate Complaints. All three cases have been consolidated.

Each of the remaining twenty-four Antonelli Plaintiffs and remaining three Deegan Plaintiffs failed the 1999 firefighter exam because each scored less than 46 (the cut-off score) on Part II. One of the Antonelli Plaintiffs and one of the Deegan Plaintiffs identify themselves as Hispanic males; the others identify themselves as non-Hispanic white or Caucasian males. Some of the individual Plaintiffs had applied for appointment by cities that are defendants in *United States v. New Jersey,* while others applied for appointment by cities that are not defendants. Plaintiff New Jersey State Firemen's Mutual Benevolent Association ("FMBA") is one of several fire service labor organizations in New Jersey. Although none of the individuals who took the 1999 exam was an FMBA member, the FMBA professes to have an interest in the exam both on behalf of its members and on behalf of non-minority and non-member firefighter candidates.

The Antonelli and Deegan Plaintiffs allege that New Jersey (the "State"), the NJDOP, and NJDOP officials (collectively, the "State Defendants") violated Plaintiffs' rights to due process and equal protection under the Fifth and Fourteenth Amendments to the United States Constitution, their rights secured by 42 U.S.C. § 1983, and their rights under the New Jersey Constitution and New Jersey civil service law. Plaintiffs also claim that the NJDOP's administration and scoring of the 1999 exam violated the 1980 Consent Decree entered in *United States v. New Jersey* and later orders in that case, particularly the Order of July 30, 1999.

Specifically, the Antonelli and Deegan Plaintiffs allege that Part II of the exam was not job-related and that the NJDOP intentionally designed, implemented, and/or scored the exam in a race-conscious manner. Plaintiffs allege that the NJDOP manipulated the scoring of the exam and treated Plaintiffs differently based on race in order to increase the number of minority candidates on the eligibility lists. In

addition, Plaintiffs allege that the NJDOP violated the Order of July 30, 1999, by according the biodata component of the exam more than a one-third weight. Lastly, Plaintiffs allege that the State Defendants scored the exam in an arbitrary, capricious, and unreasonable manner and did not allow Plaintiffs sufficient access to test materials relating to the biodata component, including copies of their answers, the questions, the answer key, or any individualized information about their performance.

The FMBA Complaint contains similar allegations on behalf of the FMBA, its members, and non-minority firefighter candidates. In addition, that Complaint alleges that the State Defendants violated Title VII of the Civil Rights Act of 1964, intentionally interfered with the FMBA's ability to provide adequate representation to its members and future members, and violated what the FMBA alleges are its members' Fourteenth Amendment due process rights to safety by using an exam that was discriminatorily scored.

As relief Plaintiffs request that the Court: (1) declare the biodata component of the 1999 exam invalid; (2) order the NJDOP to re-score the exam without the biodata component or, alternatively, to re-score the biodata component; (3) order the NJDOP to issue new firefighter rankings and a new eligibility list; (4) award counsel fees and costs; and (5) award other relief including, but not limited to, monetary damages and equitable remedies. The Antonelli and Deegan Plaintiffs also seek compensatory damages, punitive damages, back pay, seniority status, and benefits.

Each Complaint names as defendants the State, several NJDOP officials in their official capacities, and the United States. The United States is named as a necessary party pursuant to Federal Rule of Civil Procedure 19. None of the twelve cities that are defendants in *United States v. New Jersey* are named as defendants in these consolidated actions.

The State and the United States each bring a Motion for Summary Judgment. Plaintiffs bring a Cross–Motion for Summary Judgment. Defendants also bring a Motion to Strike the October 20, 2003, confidential Declaration [2] of Plaintiffs' attorney Robert J. Rohrberger (the "Rohrberger Declaration") because of alleged procedural and substantive deficiencies.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *See Celotex v. Catrett*, 477 U.S. 317, 318, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is

2. The declaration was filed under seal because it contains firefighter exam materials, such as test questions and answers, which are subject to a protective order.

some metaphysical doubt as to the material facts in question." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *See Sound Ship Building Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3d Cir.1976), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976). At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Wahl v. Rexnord, Inc.* 624 F.2d 1169, 1181 (3d Cir.1980).

## DISCUSSION

### *FMBA's Standing*

Defendants argue that the FMBA lacks standing to raise the claims asserted in its Complaint. The FMBA contends that it has standing by virtue of its role in protecting the safety of its members. It argues that the scoring of only the teamwork questions from the biodata component rendered the exam invalid and non-job-related. The FMBA claims that as a result, there is a chance that unqualified candidates will become firefighters, thereby threatening the safety of current FMBA members. The FMBA also asserts that it has direct standing as to its tortious interference claim. It does not challenge Defendants' assertion that it lacks standing as a representative of the candidates who failed the 1999 firefighter exam.

To satisfy the standing requirements of Article III of the United States Constitution, "a plaintiff must establish that it has suffered a cognizable injury that is causally related to the alleged conduct of the defendant and is redressable by judicial action." *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 283 (3d Cir.2002) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "Associations may satisfy these elements by asserting claims that arise from injuries they directly sustain. Absent injury to itself, an association may pursue claims solely as a representative of its members." *Id.* (citations omitted). To claim associational standing, a group must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

As a threshold matter, the FMBA must establish a cognizable injury to itself (to claim direct standing) or to its members (to claim associational standing). It has done neither. A cognizable injury, or "injury in fact," must be "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth*, 528 U.S. at 180, 120 S.Ct. 693 (citing *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130).

The FMBA lacks direct standing as to its tortious interference claim. Its Complaint alleges that the group was injured by the NJDOP's failure to provide it with the biodata testing materials. The FMBA has not proffered any concrete and particularized facts to establish how the

NJDOP's inaction interfered with its ability to represent its members.

■ The FMBA also lacks associational standing to pursue the claims of its members. It argues that its members' "right to safety and security" under the Fourteenth Amendment was injured by the potential hiring of unqualified candidates based on an invalid and non-job-related exam. The due process clause of the Fourteenth Amendment, however, does not impose a duty on a government employer to provide its employees a safe working environment. *Collins v. City of Harker Heights,* 503 U.S. 115, 126, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). The cases advanced by the FMBA do not support its position. *Ingraham v. Wright* found a right to freedom from government-imposed bodily restraint and punishment without due process of law. 430 U.S. 651, 673–74, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (in the context of corporal punishment in public schools). Such intentional infliction of harm is very different from the conduct alleged here. *Washington v. District of Columbia* held that a state has no constitutional obligation to provide a safe working environment for its employees. 802 F.2d 1478, 1482 (D.C.Cir.1986). The Fourteenth Amendment does not protect employees who voluntarily put themselves in harm's way because they are not at the mercy of the government. "If they deem the terms of their employment unsatisfactory, e.g., if salary, promotion prospects, or safety are inadequate, they may seek employment elsewhere." *Id.*

Because the FMBA has not established a cognizable injury to itself or its members, it lacks standing to pursue the claims asserted in its Complaint. The FMBA Complaint is dismissed.

### Abstention

■ The State argues that the Court should abstain from reviewing Plaintiffs' claims because there are ongoing and adequate state court proceedings. *See Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Plaintiffs filed administrative appeals with the Merit System Board of the NJDOP challenging, among other things, their results on the biodata component. The appeals have progressed to the Superior Court of New Jersey, Appellate Division.

■ "In order for a federal court to abstain under the *Younger* doctrine: (1) there [must be] ongoing state proceedings that are judicial in nature; (2) the state proceedings [must] implicate important state interests; and (3) the state proceedings [must] afford an adequate opportunity to raise federal claims." *Anthony v. Council,* 316 F.3d 412, 418 (3d Cir.2003) (citations omitted).

■ "[I]n determining whether *Younger* abstention is proper, where a governmental entity is party to the litigation, courts have consistently distinguished between 'coercive' and 'remedial' state proceedings." *Assisted Living Assocs. of Moorestown, L.L.C. v. Moorestown Tp.,* 996 F.Supp. 409, 432 (D.N.J.1998) (citing *Ohio Civil Rights Comm'n v. Dayton Christian Sch.,* 477 U.S. 619, 627 n. 2, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986)). Abstention is only proper when the state court proceeding is a coercive action instituted by the state. *Id. See also Alleghany Corp. v. Haase,* 896 F.2d 1046, 1053 (7th Cir.1990) (Posner, J.) ("*Younger* is confined to cases in which the federal plaintiff had engaged in conduct actually or arguably in violation of state law, thereby exposing himself to an enforcement proceeding in state court which, once commenced, must be allowed to continue uninterrupted to conclusion.")

The administrative appeals filed by Plaintiffs are clearly remedial in nature.

"Plaintiffs are not attempting to use the federal forum as an end run around state enforcement efforts. Rather, Plaintiffs have chosen to assert their federally protected rights in federal court." *Assisted Living Assocs.*, 996 F.Supp. at 433. Abstention is not warranted in this circumstance.

### Antonelli and Deegan Plaintiffs' Standing to Enforce the Consent Decree and Orders in United States v. New Jersey

■ The Antonelli and Deegan Plaintiffs seek to enforce the 1980 Consent Decree and the Order of July 30, 1999. The Order is part of the Court's continuing administration of the Consent Decree. Defendants assert that Plaintiffs lack standing to enforce the Consent Decree or, by extension, the Order.

A court in this district recently addressed this precise issue. In a case involving an attempt by non-parties to enforce the Consent Decree at issue in this case, the court noted that "[i]t is well-established that only parties to a consent decree may enforce it." *Bennett v. City of Atlantic City*, 288 F.Supp.2d 675, 683 (D.N.J.2003) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)). "Although non-parties may initiate proceedings in a separate action to challenge actions taken pursuant to the consent decree where those actions support a claim for violation of constitutional rights or other federal law, they are barred from suing under the decree itself." *Id.* (citation and quotes omitted).

None of the Plaintiffs are parties to the Consent Decree. The Antonelli and Deegan Plaintiffs lack standing to enforce the Consent Decree or the Order of July 30, 1999.

### New Jersey's Sovereign Immunity

Defendants argue that Plaintiffs' remaining claims are barred by New Jersey's sovereign immunity pursuant to the Eleventh Amendment, with one exception. The United States concedes that sovereign immunity does not bar Plaintiffs' § 1983 claims against the NJDOP officials sued in their official capacities for prospective, injunctive relief. *See Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

■ Defendants bear the burden of proving that they are entitled to sovereign immunity. *See Chisolm v. McManimon*, 275 F.3d 315, 323 (3d Cir.2001). This broad immunity "applies regardless of whether a private plaintiff's suit is for monetary damages or some other type of relief." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 765, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002).

■ Sovereign immunity is routinely extended to state agencies and state officials acting in their official capacities where it is shown that "the state is the real, substantial party in interest." *Bennett*, 288 F.Supp.2d at 679 (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945)).

[T]o determine if state agencies, officials or political subdivisions are arms of the state entitled to immunity under the Eleventh Amendment, the Court must examine: (1) whether payment of a judgment would come from the state treasury; (2) the status of the entity under state law; and (3) the entity's degree of autonomy. Although no one factor is determinative, the first factor is generally deemed the most important.

*Bennett*, 288 F.Supp.2d at 681 (citing, *inter alia, Chisolm*, 275 F.3d at 323) (citations omitted). The NJDOP is an agency within the executive branch of the New Jersey state government. The named NJDOP

officials are employees of the State. Any judgment against the NJDOP or the NJDOP officials acting in their official capacities would be paid by the State. Thus, the NJDOP and the officials are arms of the State and are entitled to Eleventh Amendment immunity.

 Although broad, sovereign immunity is not absolute. Two exceptions exist in addition to the exception for suits for prospective, injunctive relief against state officials under *Ex parte Young.* First, a state can consent to suit in federal court. *E.g., Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). State waivers of immunity are narrowly construed and generally require the state to either voluntarily invoke the federal court's jurisdiction or make a "clear statement" that it intends to invoke such jurisdiction. *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 675–76, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). Second, Congress may abrogate state sovereign immunity "in the exercise of its power to enforce the Fourteenth Amendment." *College Sav. Bank,* 527 U.S. at 670, 119 S.Ct. 2219. To do so, Congress must make its intention "unmistakably clear in the language of the statute." *Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (citations and quotes omitted).

 Plaintiffs argue that the State waived its sovereign immunity by entering into the 1980 Consent Decree. They cite the Supplemental Consent Order, which provides that any litigation involving *that* Order brought in state court must be removed to federal court. (Supplemental Consent Ord. para. 31.) Plaintiffs also point out that the original Consent Decree requires litigation concerning the Decree to be brought in federal court. As example, the Decree requires that

Should plaintiff United States ... determine that the promotional selection process will have the purpose or effect of discrimination against black or Hispanic applicants ... the affected parties shall meet ... to discuss resolution of the matter. If the parties fail to resolve the matter, *any affected party may move the Court for resolution.*

(Consent Ord. para. 8, emphasis added.) There are a number of other instances in the Decree in which parties to the Decree agree to resolve their disputes in the federal district court.

The State's entry into the Consent Decree is not sufficient to waive its sovereign immunity from Plaintiffs' civil rights claims. As another court in this district held recently with regard to the same Decree, the provisions of the Decree do not constitute

> the type of explicit waiver needed to subject the State to this Court's jurisdiction for federal civil rights claims brought twenty years after the decree was signed and brought by Plaintiffs who are not parties to the decree. *See Vulcan Pioneers of N.J. v. City of Newark,* Civ. No. 02–5802, slip op. at 7–8 (D.N.J. May 27, 2003) (finding that "New Jersey did not make a 'clear declaration' that it intended to submit itself to federal jurisdiction over various civil rights claims brought by Plaintiffs in 2003 when it waived its immunity in 1977 and agreed to the Consent Decree in 1980").

*Bennett,* 288 F.Supp.2d at 682–83. While it is conceivable that by entering into the Consent Decree, the State waived its sovereign immunity for purposes of Plaintiffs' claims under the Decree itself, the Court need not determine that issue because Plaintiffs lack standing to bring such claims. *See id.* at 683.

■ It is also well-established that Congress's passage of 42 U.S.C. § 1983 did not abrogate the states' Eleventh Amendment immunity. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Thus, sovereign immunity bars Plaintiffs' federal claims except for those against the NJDOP officials sued in their official capacities for prospective, injunctive relief.

■ Plaintiffs point out correctly that federal claims for monetary relief can be maintained against state officials sued in their *personal* capacities. *See Hafer v. Melo*, 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). However, Plaintiffs have asserted their claims against the individual Defendants in their official capacities only. (Stipulation filed 7/30/02.) Plaintiffs' federal claims for monetary relief are barred.

■ Plaintiffs' state law claims are also barred by the State's sovereign immunity. Although the *Ex parte Young* exception permits *federal* law claims for prospective, injunctive relief against state officials named in their official capacities, this exception does not apply to state law claims. *Allegheny County Sanitary Authority v. U.S. Envtl. Protection Agency*, 732 F.2d 1167, 1174 (3d Cir.1984) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). Moreover, Plaintiffs have not shown that the State has explicitly waived its immunity from suit on state law claims in *federal* court, *see Atascadero*, 473 U.S. at 241, 105 S.Ct. 3142, or that Congress has abrogated it. The New Jersey Law Against Discrimination "does not contain the express language required to waive the State's immunity from suit in federal court." *Bennett*, 288 F.Supp.2d at 683. The State is also immune from suit under the New Jersey Tort Claims Act. *Garcia v. Richard Stockton Coll. of N.J.*, 210 F.Supp.2d 545, 550 (D.N.J.2002). Plaintiffs' state law claims asserted in this Court are dismissed.

## § 1983 Claims

To establish a claim under 42 U.S.C. § 1983, Plaintiffs must show that the NJDOP officials acted under color of state law to deprive them of a federal statutory or constitutional right. Plaintiffs assert violations of their constitutional rights to equal protection and due process of law.

### Equal Protection

■ The Equal Protection Clause of the Fourteenth Amendment prohibits the states from intentionally discriminating between individuals on the basis of race. *Shaw v. Reno*, 509 U.S. 630, 642, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194, 123 S.Ct. 1389, 155 L.Ed.2d 349 (2003) (citation and quotes omitted).

■ There are three ways that such intentional discrimination can be shown. A law or policy that explicitly classifies citizens on the basis of race is constitutionally suspect and is subject to strict scrutiny. *See Hunt v. Cromartie*, 526 U.S. 541, 546, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999). In addition, a suspect classification is created when a facially neutral law or policy is applied differently on the basis of race. *See Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Finally, a facially neutral law or policy that is applied evenhandedly may still violate equal protection if it was motivated by discriminatory intent and it has a racially discriminatory impact. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

The gravamen of Plaintiffs' equal protection claim is that the State Defendants intended to treat white, Hispanic and black candidates for firefighter differently, not, admittedly, by giving a different exam to candidates belonging to different racial and ethnic groups or by scoring one exam given to all candidates on different scales, but, more subtly and insidiously, by redesigning the exam after it was administered and scored, so as to increase the number of candidates belonging to favored racial or ethnic groups in the pool of those who passed, and to eliminate from that pool many otherwise qualified white male candidates.

(Pls.' Br. at 64.)

■ The administration and scoring of the 1999 firefighter exam did not classify candidates on the basis of race. Candidates were evaluated on the basis of their proficiency in skills deemed necessary for firefighting. They were not explicitly chosen by race. That the NJDOP designed and scored the exam in order to diminish the adverse impact on minority candidates does not in itself constitute an express racial classification. *See Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999).

■ Plaintiffs also cannot establish that the State Defendants administered the facially race-neutral exam in an intentionally discriminatory manner. All candidates took the same exam and all exams were scored using the same scoring key. *Cf. id.* at 50 ("The police officers' examination was administered and scored in the same manner for all applicants."). All candidates were required to achieve the same minimum cut-off score on each exam component, and all candidates who passed each component of the exam were ranked according to a final score with each component equally weighted. Each Plaintiff

failed the exam because he failed to achieve a score of 46 or higher on Part II, not because of his race.

■ Finally, Plaintiffs cannot show that the 1999 exam, although facially race-neutral and applied non-discriminatorily, nevertheless had a racially discriminatory impact on them and was adopted by the State Defendants with the intent to discriminate. Plaintiffs allege that the decision to score Part II using only the teamwork data and to set the cut-off score at 46 discriminated against them based on their race because those decisions were allegedly motivated by a desire to increase minority representation on firefighter eligibility lists. As an initial matter, it seems clear that the NJDOP's decision to score Part II using only the teamwork data was made before the administration of the exam. Defendants told Judge Politan at the June 15, 1999, hearing that only the teamwork data would be scored, and he approved this scoring method. Defendants concede that the cut-off score for Part II was determined after the administration of the exam. The parties dispute whether it was set solely to minimize adverse impact, though that was admittedly one of Defendant's primary goals. Even so, teamwork is not racially sensitive. Plaintiffs have not shown that teamwork skills are unique to or absent from any particular race.

■ Plaintiffs cannot demonstrate that the State Defendants acted with discriminatory intent. Though they claim that such intent can be inferred from the NJDOP's alleged attempt to minimize adverse impact on minorities, they offer no legal support for this assertion. Discriminatory intent "implies that the decision-maker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable

group." *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), *cited in Pryor v. Nat'l Collegiate Athletic Ass'n,* 288 F.3d 548, 562 (3d Cir.2002). "A mere awareness of the consequences of an otherwise neutral policy will not suffice." *Pryor,* 288 F.3d at 562 (citing *Feeney,* 442 U.S. at 277–78, 99 S.Ct. 2282). There is no evidence to suggest that the State Defendants designed the 1999 exam "because of" some desire to adversely affect Plaintiffs or non-minority candidates generally. *Cf. Hayden,* 180 F.3d at 51 ("A desire to reduce the adverse impact on black applicants and rectify hiring practices ... is not analogous to an intent to discriminate against non-minority candidates.").

Plaintiffs' equal protection claims are dismissed.

### Due Process

Plaintiffs assert that their Fourteenth Amendment right to procedural due process was violated when the NJDOP refused to allow them access to the biodata component testing materials as part of their administrative appeals. They also argue that they had a protected property interest in fair and job-related testing procedures which was deprived by the NJDOP's allegedly arbitrary and capricious scoring of the exam.

The Fourteenth Amendment to the United States Constitution prohibits states from depriving any person of life, liberty, or property, without due process of law. "[T]he first step in analyzing a procedural due process claim is to determine whether the asserted individual interests are encompassed within the fourteenth amendment's protection of life, liberty, or property." *Thomas v. Town of Hammonton,* 351 F.3d 108, 113 (3d Cir.2003). If protected interests are implicated, the Court must decide what procedures constitute "due process of law." *Robb v. City of*

*Philadelphia,* 733 F.2d 286, 292 (3d Cir. 1984).

Plaintiffs must first show that they had a protected interest. "For the purposes of the Due Process Clause, property interests are defined by state law." *Larsen v. Senate of the Com. of Pa.,* 154 F.3d 82, 92 (3d Cir.1998). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

Plaintiffs do not have a protected property interest. The gravamen of Plaintiffs' claims is that they were excluded from the firefighter eligibility lists without due process. Though Plaintiffs had a desire to become firefighters, they had no legitimate claim of entitlement. Even a candidate "who successfully passes an examination and is placed on an eligible list does not thereby gain a vested right to appointment." *In re Crowley,* 193 N.J.Super. 197, 210, 473 A.2d 90 (App.Div.1984). Plaintiffs did not pass the exam and clearly did not have a protected interest in being placed on the eligibility lists. Even if Plaintiffs could show they had a protected interest, they have not shown that the administrative procedures available under New Jersey law are inadequate to constitute due process. "The administrative procedures afforded by ... the New Jersey Department of Personnel ... satisfy the requirements of the Due Process Clause." *Pollock v. City of Ocean City,* 968 F.Supp. 187, 191 (D.N.J.1997) (citing *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

Plaintiffs' due process claims are dismissed.

### Uniform Guidelines on Employee Selection Procedures

In their Complaints, Plaintiffs allege that the State Defendants violated provisions of the *Uniform Guidelines on Employee Selection Procedures*, 28 C.F.R. § 50.14. The *Uniform Guidelines*, however, are merely guidelines established by federal agencies to provide guidance to agencies and employers and to promote consistency in the interpretation and enforcement of equal opportunity laws and regulations. They do not create a cause of action.

Plaintiffs' claims of violations of the *Uniform Guidelines* are dismissed.

### The Rohrberger Declaration

Defendants move to strike the Declaration of Plaintiffs' attorney Robert J. Rohrberger, which was submitted in support of Plaintiffs' Cross–Motion for Summary Judgment. Defendants move on the grounds that 1) the Declaration was untimely submitted; 2) the Declaration and its enclosures were not served on all counsel; 3) the Declaration concerns matters of which Rohrberger has no personal knowledge; and 4) the Declaration contains Rohrberger's opinion and inferences concerning matters of scientific, technical, or other specialized knowledge about which he is not qualified to testify.

During a teleconference on September 17, 2003, the Court ruled that Plaintiffs could submit for the Court's consideration the biodata component and associated answer key used on the 1999 exam. Defendants objected to the submission of this information as irrelevant to the issues before the Court.

Plaintiffs submitted the Rohrberger Declaration on or about October 21, 2003. Attached to the Declaration were the following exhibits: Exhibit 1, a research version of the biodata component; Exhibit 2, the biodata component used on the 1999 exam; Exhibit 3, the answer key; Exhibit 4, an excerpt from Dr. Mitchell's deposition testimony which discusses how the answer key works; Exhibit 5, a list of the questions that comprise the physical subpart of the biodata component; Exhibit 6, a list of the questions that comprise the cognitive subpart of the biodata component; and Exhibit 7, a list of the questions that comprise the teamwork subpart of the biodata component. The Declaration itself consists of Rohrberger's explanation of how to read the answer key and contains a number of statements apparently based on his understanding of Dr. Mitchell's deposition testimony.

Plaintiffs did not serve a copy of the Rohrberger Declaration on Defendants. Plaintiffs claim that they understood the Court's order to mean that Defendants were not to be provided a copy of the Declaration or exhibits unless they specifically requested them. Plaintiffs claim that pursuant to a request by Barbara Thawley, counsel for the United States, they provided her with copies of Exhibits 5, 6, and 7. Thawley asserts that she has not received any of the exhibits.

In light of the Court's order that Plaintiffs could submit the biodata component and answer key, Defendants do not object to the submission of Exhibits 1–4. They do object to Exhibits 5–7 and the Declaration itself. Plaintiffs are required to serve these documents on Defendants, *see* Fed. R.Civ.P. 5(a), and the Court ordinarily would require them to do so. In this case, however, the matter is moot, as the Court did not consider the Rohrberger Declaration or exhibits in its decision. The content of the questions in the biodata component and the answer key is irrelevant to Plaintiffs' claims. This information is not probative as to any alleged discriminatory intent on the part of Defendants. Without

such intent, Plaintiffs cannot maintain their equal protection claims. The information also is not probative as to the existence of Plaintiffs' alleged property interest in being placed on the firefighter eligibility lists. Without such an interest, Plaintiffs cannot maintain their due process claims.

Because the Court did not consider the Rohrberger Declaration, the Motion to Strike is dismissed as moot.

## CONCLUSION

Defendants' Motions for Summary Judgment are granted. Plaintiffs' Cross-Motion for Summary Judgment is denied. The Motion to Strike is dismissed as moot.

SO ORDERED.

### ORDER

This matter having been opened to the Court by Barbara E. Thawley, Esq., appearing for Defendant United States of America, and Lisa Dorio Ruch, appearing for Defendant State of New Jersey, in the presence of Robert J. Rohrberger, Esq., and Martin S. Kaufman, Esq., attorneys for Plaintiffs, and the Court having heard argument of counsel, and good cause appearing therefor,

It is on this 31st day of March, 2004,

ORDERED that the United States's Motion to Strike the October 20, 2003, Declaration of Robert J. Rohrberger is DISMISSED as moot; and

ORDERED that the United States's Motion for Summary Judgment is GRANTED; and

ORDERED that the State of New Jersey's Motion for Summary Judgment is GRANTED; and

ORDERED that Plaintiffs' Cross-Motion for Summary Judgment is DENIED.